980 F.2d 740
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Neil WOODMAN, Robert Thomas Homick, and Steven Michael
Homick, Defendants-Appellants.
 Nos. 91-10216, 91-10217 and 91-10238.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 3, 1992.
Decided Dec. 4, 1992.
As Amended Jan. 25 and May 10, 1993.
 
 Before BOOCHEVER, NOONAN and O'SCANNLAIN, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellant Neil Woodman appeals his conviction for interstate travel in the aid of murder for hire. Appellant Steven Michael Homick (hereinafter S. Homick) appeals his convictions for RICO, interstate transportation of stolen property, conspiracy to distribute a controlled substance, possession of a controlled substance with the intent to distribute, conspiracy to commit wire fraud, wire fraud, interstate travel in aid of racketeering, and interstate travel in the aid of murder for hire. Appellant Robert Thomas Homick (hereinafter R. Homick) appeals his convictions for RICO, interstate transportation of stolen property, conspiracy to commit wire fraud, wire fraud, and interstate travel in the aid of murder for hire. We affirm.
 
 Facts
 
 3
 Given that R. and S. Homick challenge the sufficiency of the evidence for their convictions, we present the facts in the light most favorable to the prosecution. The following forms the basis for the substantive offenses as well as the RICO predicates.
 
 1. Woodman Murders
 
 4
 In 1984, appellant Neil Woodman and his brother Stewart hired the Homicks to kill their parents, Gerald and Vera Woodman. On September 25, 1985, which was Yom Kippur, the Homicks and some confederates carried out the contract killing. Proof of these murders took up a large part of this trial.
 
 
 5
 For many years the Woodman brothers had helped their father manage the family plastics business, Manchester Products. In 1981 family fights over the business led to a lawsuit. Eventually, Neil and Stewart were ordered to purchase their parents' interest. They maintained, however, a $500,000 life insurance policy that the company held on the life of their mother.
 
 
 6
 A price war with a competing company that was then set up and run by Gerald Woodman, as well as pressure from its main creditor, caused Manchester Products to suffer financial difficulties. The events surrounding the lawsuit, the price war, and the life insurance policy fed the hatred the Woodman brothers held for their father. The brothers decided to have their parents killed, in part to get the insurance on their mother's life, in part to get rid of their father. They hired the Homicks. The Homicks surveilled Gerald and Vera's home for many months before they concluded that Yom Kippur would provide the best opportunity because the couple would be certain on that date to leave their home. S. Homick and another conspirator ambushed and killed the Woodmans in their garage as they returned from their post-Yom Kippur dinner at the home of Vera's sister. The brothers Woodman paid the brothers Homick for the successful murders.
 
 
 7
 The other crimes of the Homicks did not involve the Woodmans. The Homick brothers, such ready tools of the Woodmans in murder, were ready for all kinds of other vile and brutal villainies.
 
 2. The Tipton Murders and Robbery
 
 8
 On December 11, 1985, S. Homick entered the Las Vegas home of Bobby Jean Tipton and murdered Mrs. Tipton, her maid Marie Bullock, and James Myers, a delivery man, in order to steal what he thought were hundreds of thousands of dollars worth of jewelry. In 1989, a Nevada court sentenced Homick to death for these murders.
 
 
 9
 Beginning in January 1986, S. and R. Homick sought to sell some of the jewelry stolen from the Tipton home. Law enforcement agents observed the Homicks in Los Angeles meeting with potential buyers, and later recovered some of the Tipton jewelry from the Los Angeles residence of a participant in the Woodman murders.
 
 
 10
 Shortly after the Homicks were observed in Los Angeles, the Las Vegas Metro Police Department recovered a ring stolen from the Tiptons. When the Homicks learned that the ring was in police custody, they devised a scheme to get it back. They intended to create a phony affidavit of ownership so that a coconspirator could claim it as his own. The police intercepted several telephone conversations between the Homicks in which they discussed the plan.
 
 3. The Godfrey Murder
 
 11
 In early 1985, S. Homick learned that a neighbor Henry Godfrey had received $14,000 in severance pay which he kept in cash in his home. In June of that year, S. Homick and Michael Dominguez went to the Godfrey home and demanded that Henry Godfrey give them the $14,000. When Godfrey refused, S. Homick beat him with a long metal shoe horn, crushed his index finger with some pliers, and, with Dominguez's help, held his head underwater in the bathtub. While they were holding his head underwater, he suffered a heart attack and died.
 
 4. Arson in Hawaii
 
 12
 In March 1985, a man named Lawrence Ettinger asked S. Homick if Homick would burn down a house that Ettinger owned in Hawaii so that he could collect the insurance proceeds. S. Homick in turn offered Michael Dominguez $5,000 to do the job. When Dominguez agreed, Homick purchased airline tickets for Dominguez in the name of Mike Dome. On April 13, 1985, Dominguez doused the house with gasoline and set it on fire.
 
 5. The Drug Distributions
 
 13
 S. Homick ran a cocaine distribution operation from at least 1982 until his arrest in 1986. He operated primarily out of New Jersey until 1984, when he moved to Las Vegas. There he formed a partnership with his brother William Homick to distribute cocaine out of Art's CB, an electronics store in Las Vegas. Between January and March 1986, Nevada police intercepted numerous telephone conversations over S. and William Homick's phone lines regarding their drug business.
 
 Proceedings
 
 14
 Convicted of these crimes in a 35-day trial, Neil Woodman and R. and S. Homick appeal. Each received life sentences for their roles in the murder for hire scheme; the Homicks received between five and twenty years for the other convictions, to run concurrently with the life sentences.
 
 Discussion
 1. Motions to Sever
 
 15
 Woodman and R. Homick seek a new trial on the grounds that the district court erroneously denied their motions to sever. Both defendants raised the motion twice before trial and once during the government's case-in-chief. However, they waived their right to appeal this issue because they did not renew the motion at the close of all the evidence. United States v. Plache, 913 F.2d 1375, 1378-79 (9th Cir.1990). There we found waiver when the defendant moved to sever once before trial, once during the trial, and once at the close of the government's case-in-chief. Id. Woodman and R. Homick were no more diligent than the defendant in Plache. They have waived the issue.
 
 2. Motion to Continue
 
 16
 Approximately one and a half months before trial, Woodman moved for a continuance. The district court denied the motion. We review a district court's decision to grant or deny a continuance for an abuse of discretion. United States v. Robinson, 967 F.2d 287, 291 (9th Cir.1992).
 
 
 17
 To determine whether the district court abused its discretion, this court considers several factors: "1) the extent of the defendant's diligence in readying the defense; 2) the likelihood the continuance would have satisfied defendant's need; 3) the inconvenience to the court, opposing party and witnesses; and 4) the extent to which the defendant may have been harmed." United States v. Shirley, 884 F.2d 1130, 1134 (9th Cir.1989). Given that Woodman had eighteen months from indictment until trial to prepare his defense, he cannot show that he was diligent. Furthermore, because the district court, the prosecution, the other defendants, and the witnesses were all ready to go to trial, continuing this complex trial would have been very inconvenient. Therefore, the district court did not abuse its discretion.
 
 
 18
 3. Admission of Dominguez's Prior Recorded Testimony
 
 
 19
 Each defendant objects to the admission of the prior recorded testimony of Michael Dominguez. We review the decision to admit hearsay testimony for an abuse of discretion. United States v. Payne, 944 F.2d 1458, 1472 (9th Cir.1991), cert. denied, 112 S.Ct. 1598 (1992).
 
 
 20
 Because Dominguez refused to testify, the district court admitted Dominguez's preliminary hearing testimony from the California murder trial of Woodman and the Homicks as well as Dominguez's testimony from the Nevada murder trial of S. Homick, pursuant to Fed.R.Evid. 804(b)(1). Dominguez's testimony from the Nevada trial was offered to prove part of one of the predicate acts supporting the RICO charge. The defendants claim that Dominguez was not truly unavailable within the meaning of the rule because the district court did not actually immunize him. However, the court did discuss immunity with Dominguez and eventually found him in contempt once it became clear that he would not testify. Dominguez was not available.
 
 
 21
 The defendants also argue that the government was responsible for Dominguez's intransigence and complain that the district court did not hold a hearing on the matter. However, the court did permit the parties to question Dominguez about his refusal to testify, and after a sidebar conference the court found that the defendants did not present any credible evidence that the federal government caused Dominguez's unavailability. RT Day 11 (sidebar) 11, 25. In so ruling the court did not abuse its discretion.
 
 
 22
 R. Homick was not a party to the Nevada murder trial of his brother; consequently, the use of Dominguez's testimony from that trial against R. Homick may have been error. See Fed. R. Evid. 804 (b) (1). Nevertheless, having reviewed the entire trial record we hold that any possible error was harmless beyond a reasonable doubt. See Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986). The testimony from the Nevada trial concerning the Tipton Murders was relevant to prove parts of Predicate Act IV of the RICO count. However, the indictment did not allege that R. Homick had anything to do with the Tipton Murders. The allegations in Predicate Act IV relevant to R. Homick -- interstate transportation of stolen property -- were proved through other evidence, viz., the testimony of Timothy Catt, Ron Bryl, and taped telephone conversations. Indeed, by convicting R. Homick of the interstate transportation of stolen property (Count II), the jury found beyond a reasonable doubt that R. Homick participated in the interstate transportation portion of Predicate Act IV. Consequently, the possibly wrongful use of Dominguez's Nevada trial testimony against R. Homick was harmless beyond a reasonable doubt.
 
 
 23
 R. Homick complains about "prejudice" he suffered as a result of the admission of Dominiguez's testimony. For instance, he complains that through Dominguez's testimony the jury learned of Dominguez's past crimes and the deal Dominguez received from Nevada in exchange for his testimony. Such information tends to impeach Dominguez, which was to R. Homick's advantage. R. Homick also argues that after hearing Dominguez's Nevada testimony the jury might have thought that he was involved in other crimes perpetrated by his brother S. Homick. These complaints amount to arguments that R. Homick was improperly denied a severance. As noted above, R. Homick has waived this argument.
 
 
 24
 The defendants' other arguments that the district court violated their Confrontation Clause rights when it admitted Dominguez's past testimony fail given the Supreme Court's holding in Ohio v. Roberts, 448 U.S. 56, 66 (1980) (no Confrontation Clause violation if declarant is unavailable and the statement falls within a firmly rooted hearsay exception).
 
 4. Siegel Videotaped Deposition
 
 25
 R. Homick complains that the district court erroneously admitted Steward Siegel's videotaped deposition testimony, and that the admission of the deposition violated his Sixth Amendment rights. We review decisions to admit a deposition for an abuse of discretion. United States v. Bland, 961 F.2d 123, 126 (9th Cir.), cert. denied, 61 U.S.L.W. 3260 (1992).
 
 
 26
 Fed.R.Crim.P. 15(e) permits the use of a deposition if the witness is unavailable as defined in Fed.R.Evid. 804(a) and the deposition is otherwise admissible under the Federal Rules of Evidence. By the time the case went to trial, Siegel was dead; needless to say he was unavailable. The deposition was therefore admissible because it satisfied the hearsay exception for prior recorded testimony in Fed.R.Evid. 804(b)(1). As noted in Woodman's Sixth Amendment objection to the use of Dominguez's prior recorded testimony, the Supreme Court has held that such use does not violate the Confrontation Clause. See Roberts, 448 U.S. at 66.
 
 
 27
 Homick also complains, however, that his attorney could not adequately cross-examine Siegel because the government and the court did not give him enough time to prepare for the deposition. The deposition was taken on very short notice. However, the deposition lasted three days, so Homick's lawyer could have reviewed the materials in the evenings, and the lawyer was able to confer with Homick throughout the deposition. Furthermore, counsel for the other defendants, who had similar interests in Siegel's testimony, were able to develop effectively the cross-examination of Siegel. Although the circumstances were less than ideal, the Confrontation Clause only guarantees "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (emphasis in original).
 
 5. Wiretap Affidavit
 
 28
 In January 1986 Las Vegas Metro Police Detective Dillard applied for and was granted an electronic surveillance warrant covering three telephone lines belonging to S. Homick and one line belonging to William Homick. Both R. and S. Homick requested a hearing under Franks v. Delaware, 438 U.S. 154 (1978), in order to challenge the truthfulness of Detective Dillard's statements in his affidavit in support of probable cause. The district court denied their motion, and they appeal.
 
 
 29
 Because the wiretap did not include R. Homick's telephone line, it is questionable whether he has standing to challenge the affidavit. We need not reach this question, however, because we conclude that the district court properly denied S. Homick's motion.
 
 
 30
 In order to be entitled to a Franks hearing, S. Homick must make a preliminary showing that Detective Dillard knowingly or recklessly included false statements in the warrant affidavit. Id. at 155-56. Homick contends that Detective Dillard deliberately misled the magistrate when he portrayed Steward Siegel, the FBI informant who provided evidence linking the Homicks to criminal activity, as a citizen informant rather than as a paid informant under investigation for other crimes. Another panel of this court rejected this argument in a related case. See United States v. Homick, 964 F.2d 899, 904 (9th Cir.1992). The panel concluded that "Detective Dillard properly portrayed Siegel as an individual with a criminal history who had been paid by the FBI in the past." Id. Our reading of the affidavit supports this conclusion. Therefore, the district court properly denied the motion for a Franks hearing.
 
 
 31
 S. Homick also claims that some of Siegel's statements that Detective Dillard included in the affidavit were false. Generally, the defendant may only challenge the affiant's statements in a Franks hearing. United States v. Discesare, 765 F.2d 890, 895 (9th Cir.1985). Therefore, the truthfulness of Siegel's statements are irrelevant.
 
 
 32
 In addition, S. Homick argues that the affidavit failed to include "a full and complete statement as to whether other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous" as required by 18 U.S.C. § 2518(1)(c). The government need not show that it has exhausted every conceivable alternative in order to satisfy § 2518(1)(c). Homick, 964 F.2d at 903 (citing United States v. Brone, 792 F.2d 1504, 1506 (9th Cir.1986)). We review the district court's decision on the matter for an abuse of discretion. Id.
 
 
 33
 The affidavit states that the investigation was at a standstill, that other investigative methods were unlikely to succeed in identifying all of the suspects, and that other sources of information such as Siegel were drying up. The district court, therefore, did not abuse its discretion when it found that the government had satisfied 18 U.S.C. § 2518(1)(c). Construing the same affidavit, the earlier panel in Homick concluded that the government made a sufficient showing of necessity. Homick, 964 F.2d at 903.
 
 6. Pre-Indictment Delay
 
 34
 S. Homick complains that the government delayed bringing its indictment in order to gain a tactical advantage at trial. The district court denied his motion to dismiss on this ground.
 
 
 35
 Because statutes of limitations normally provide sufficient protection to defendants, the Due Process Clause plays a limited role in protecting against prejudice from pre-indictment delay. See United States v. Lovasco, 431 U.S. 783, 789 (1977); United States v. Moran, 759 F.2d 777, 782 (9th Cir.1985), cert. denied, 474 U.S. 1102 (1986). However, when a defendant can prove 1) that he suffered actual, non-speculative prejudice from the delay, and 2) that the delay, when balanced against the prosecution's reasons for it, offends those "fundamental conceptions of justice which lie at the base of our civil and political institutions," the Fifth Amendment provides relief. United States v. Sherlock, 962 F.2d 1349, 1353-54 (9th Cir.1989), cert. denied, 61 U.S.L.W. 3335 (1992). We review a denial of a motion to dismiss for an abuse of discretion. Id.
 
 
 36
 Homick loses on the first point. Although he makes many unsubstantiated allegations of prejudice in his brief, he is unable to establish that he suffered actual, non-speculative prejudice as a result of delay. The district court did not abuse its discretion.
 
 7. Sufficiency of the RICO Count
 
 37
 R. Homick argues that Count I of the indictment, which alleges a violation of RICO, 18 U.S.C. § 1962(c), is defective because it 1) fails to allege an enterprise separate and distinct from the predicate acts, and 2) fails to allege that the predicate acts are related and that they pose a threat of continued criminal activity. The sufficiency of an indictment is reviewed de novo. United States v. Dischner, 960 F.2d 870, 886 (9th Cir.1992).
 
 
 38
 Homick's first argument is groundless. The indictment in clear language alleges an enterprise distinct from the predicate acts.
 
 
 39
 According to Homick's second argument, relatedness and continuity are separate, essential elements of a RICO offense, even though they are not specifically enumerated in the statute as such. Generally, an indictment is sufficient if it tracks the language of the statute, United States v. Zavala, 839 F.2d 523, 526 (9th Cir.), cert. denied, 488 U.S. 831 (1988), but if the statute does not contain all the essential elements of the offense, then tracking the statute is insufficient. Id.; see, e.g., United States v. Keith, 605 F.2d 462, 464 (9th Cir.1979).
 
 
 40
 Homick cites H.J. Inc. v. Northwestern Bell Tel., 492 U.S. 229 (1989), in support of the proposition that relatedness and continuity are essential elements of a RICO offense. Homick misreads the case. Although the Supreme Court in Northwestern Bell did say that in order to prove a pattern of racketeering a "prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity," id. at 239, this holding simply requires that the indictment allege facts sufficient to show that the predicate acts are related and that they pose the threat of continued criminal activity. The indictment need not, as Homick implies, treat relatedness and continuity or the threat of continuity as separate elements.
 
 
 41
 Count I of the indictment tracks the language of the statute, 18 U.S.C. § 1962(c), and key definitions contained in 18 U.S.C. § 1961. Furthermore, the indictment alleges that the criminal enterprise had a definite purpose, and it alleges a series of related acts over a substantial period of time. These allegations are enough to satisfy Northwestern Bell. See Northwestern Bell, 492 U.S. at 240, 242.
 
 8. Wearing of Prison Clothes
 
 42
 R. Homick wore prison clothes during his trial; however, before the trial began the court offered him clean civilian clothes to wear during the proceedings. Homick refused the clothes, claiming that they would aggravate a painful skin condition called shingles.
 
 
 43
 A defendant may not be compelled to appear in front of the jury wearing identifiable prison garb. Estelle v. Williams, 425 U.S. 501, 512 (1976); United States v. Rogers, 769 F.2d 1418, 1423 (9th Cir.1985). A defendant may choose, however, to dress in jail clothes. See Felts v. Estelle, 875 F.2d 785, 786 (9th Cir.1989) (citing Williams, 425 U.S. at 508). Homick claims that the court forced him to wear prison clothes due to the medical risk that wearing the civilian clothes would pose; however, the medical records that he presented to the district court in support of his request for specially treated clothes said nothing about shingles. Consequently, he cannot establish that his appearance in jail clothing was involuntary. See Jeffers v. Ricketts, 832 F.2d 476, 481 (9th Cir.1987), rev'd on other grounds sub nom. Lewis v. Jeffers, 497 U.S. 764 (1990).
 
 
 44
 9. Limitation of Direct and Cross-Examination
 
 
 45
 R. Homick argues that the district court violated his confrontation rights when it limited his cross-examination of Stewart Woodman. A district court's decision regarding the scope of cross-examination is reviewed for an abuse of discretion. United States v. Bonanno, 852 F.2d 434, 439 (9th Cir.1988), cert. denied, 488 U.S. 1016 (1989). There is no abuse of discretion so long as the jury receives sufficient information to appraise the biases and motivations of the witness. United States v. Guthrie, 931 F.2d 564, 567 (9th Cir.1991).
 
 
 46
 The district court prohibited defense counsel from asking Stewart Woodman about the grounds for his possible new trial motion in the California prosecution of the Woodman murders. The record clearly shows that the district judge prohibited inquiry into the issue because it appeared that the motion involved allegations that Stewart Woodman's wife had an affair with the attorney who was defending him in California. See RT Day 28 (Rueben) at 50-51. Because the allegations of sexual misconduct were totally irrelevant to the federal case, the judge prohibited any questions about them. In so ruling the judge did not abuse his discretion.
 
 
 47
 Homick cites Willhoite v. Vasquez, 921 F.2d 247 (9th Cir.1990), a case in which the prosecutor made a secret, more lenient deal with a witness. Homick has not produced any evidence of a secret deal; therefore, the case is inapposite. The jury in this case was presented sufficient evidence to appraise Stewart Woodman's biases and motives.
 
 
 48
 Homick incorrectly states that the district court prohibited him from asking defense witnesses about Stewart Woodman's bias. The court explicitly ruled that Homick could inquire about several matters which could show bias; it only prohibited Homick from asking questions related to the new trial motion and allegations of misconduct by his California attorney. See RT Day 28 (Ruebens) at 51-53.
 
 10. False Evidence
 
 49
 R. Homick says that the government offered testimony from Norma Drinkern which it knew to be false. Ms. Drinkern testified that she sold a pair of bolt cutters to a man she identified as R. Homick on September 14, 1985. These bolt cutters apparently were used to cut the chain on the security fence outside of Vera and Gerald Woodman's home. Homick says that the government withheld information showing that Ms. Drinkern was on vacation on September 14, 1985.
 
 
 50
 Homick also claims that since trial he has obtained part of a police report which says that a witness described one of the Woodman assailants as an "oriental." He says that the government withheld this information, which limited his cross-examination of Roger Bachman. The government disputes these allegations.
 
 
 51
 Because this matter cannot be decided without more fact-finding, it should be handled according to the procedures outlined in Fed.R.Crim.P. 33. If Homick has discovered new, exculpatory evidence, the district court may entertain a motion for a new trial even while the case is on appeal. United States v. Chronic, 466 U.S. 648, 667 n. 42 (1983); People of the Territory of Guam v. Inglett, 417 F.2d 123, 125 (9th Cir.1969). Should Homick make such a motion, the district court may, if it so chooses, hold a hearing in order to develop the factual allegations of the parties. The record is insufficiently developed for this court to resolve these issues.
 
 11. S. Homick's Diaries
 
 52
 S. Homick's diaries were admitted into evidence as a part of a stipulation between S. Homick's counsel and the government. R. Homick did not object. Nevertheless, this court may still reverse if it finds plain error affecting R. Homick's substantial rights. United States v. Musacchio, 968 F.2d 782, 791 (9th Cir.1992).
 
 
 53
 R. Homick argues that the statements in the diaries were hearsay. On the contrary, under Fed.R.Evid. 801(d)(2)(E), a statement made by a coconspirator of a party during the course and in furtherance of a conspiracy is not hearsay when offered against that party. S. Homick's diaries contained notes concerning the surveillance of Vera and Gerald Woodman's home. Therefore, they are not hearsay.
 
 12. Sufficiency of the Evidence
 
 54
 R. Homick and S. Homick challenge the sufficiency of the evidence supporting their convictions. There is sufficient evidence to support a verdict if, reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)).
 
 
 55
 The Homicks present nothing more than imaginative interpretations of the evidence which exonerate them. A review of the record in this case establishes that the government presented plenty of evidence for a reasonable jury to find all the essential elements of the offenses beyond a reasonable doubt.
 
 
 56
 We AFFIRM each conviction.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Circuit Rule 36-3