**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Richard PLACHE; James Attarian,
Defendants–Appellants.**

Nos. 88–1389, 88–1422.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 17, 1990.

Decided Sept. 7, 1990.

Julian G. Macias, Sacramento, Cal., for defendant-appellant Plache.

Albert W. Brodie, Sacramento, Cal., for defendant-appellant Attarian.

R. Steven Lapham, Asst. U.S. Atty., Sacramento, Cal., for plaintiff-appellee.

Before HUG, SKOPIL and SCHROEDER, Circuit Judges.

HUG, Circuit Judge:

Richard Plache ("Plache") and James Attarian ("Attarian") separately appeal their convictions for numerous counts of mail fraud, 18 U.S.C. § 1341 (1988), sale of an unregistered security, 15 U.S.C. §§ 77e, 77x (1988), and aiding and abetting such acts, 18 U.S.C. § 2 (1988). Plache and Attarian contend the district court failed to exclude a juror for cause, who allegedly

held an implied employment bias, and erroneously denied their motions to exclude evidence under the attorney-client privilege. Further, Plache challenges the denial of his motion to sever and the sufficiency of the evidence for mail fraud. Finally, Attarian argues a special assessment was erroneously imposed at sentencing. We affirm.

## I. *Background*

This action arose over the defendants' roles during 1982–85 in an arbitrage trading investment plan called ELMAS Trading Program, which the Government contends was a Ponzi scheme. Attarian was a director and one of the principals of the ELMAS Trading Corporation, and Plache was a member of its Advisory Council and the most successful salesman of the ELMAS Program.

The indictment charged five individuals, three of whom are not part of this appeal, with violations of the federal securities law and mail fraud. Plache was named in twenty-six of 115 original counts in the indictment, while Attarian was named in all counts.

Investors were told the ELMAS Program utilized a sophisticated computer program which allowed simultaneous trading in more than one commodity market, permitting the purchase at a low price in one market and sale at a higher price in another. Purportedly, an Arizona gold mine, owned by the ELMAS Corporation, could also be used to pay investors. Among other representations, investors were told they could earn three percent per month and up to forty-seven percent annually under some investment options. Many were informed that the ELMAS Program was exempt from federal or state securities regulations. Investors were also provided an opportunity to become sales representatives or consultants for the ELMAS Program.

Investors or investment groups were required to make a minimum investment of $100,000 in the ELMAS Program. By the end of the first quarter of 1985, approximately 5,500 individuals had made total investments of more than $75 million. The ELMAS Corporation went into receivership in April, 1985. Over the life of the program, Plache earned about $1,133,000 in commissions and fees, and Attarian was paid nearly $2 million.

## II. *Juror Exclusion*

■ Plache and Attarian challenge the trial court's denial of their motions to exclude alternate juror Sherrill Coleman ("Coleman") for cause in this mail fraud case as a result of her employment as a letter carrier with the Postal Service. They also appeal the denial of their motions for a new trial on this same ground. We review for an abuse of discretion. *See, e.g., United States v. Aguon,* 851 F.2d 1158, 1170 (9th Cir.1988) (en banc) (denial of a motion for a new trial); *United States v. Poschwatta,* 829 F.2d 1477, 1484 (9th Cir.1987) (district court's determination concerning the competency of a juror), *cert. denied,* 484 U.S. 1064, 108 S.Ct. 1024, 98 L.Ed.2d 989 (1988).

Under voir dire examination, the district court asked Coleman whether she had any connection with the investigation and whether she would be influenced if a postal inspector testified. She responded negatively to these questions and indicated she could serve impartially. On this voir dire, the court found no cause for exclusion. After the defendants exhausted their peremptory challenges, Coleman was selected as an alternate juror. During the Government's closing argument, juror Glenn Kohlmeister interrupted, indicating he was ill. The defendants objected to excusing this juror. However, Kohlmeister was excused after the court examined him. The court filled his position with alternate juror Coleman, to whom the defendants again objected.

It is well-settled that a single partial juror deprives a defendant of his Sixth Amendment right to a trial by an impartial jury. *See United States v. Eubanks,* 591 F.2d 513, 517 (9th Cir.1979) (per curiam) (citing *United States v. Hendrix,* 549 F.2d 1225, 1227 (9th Cir.), *cert. denied,* 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977)). Further, while "due process does not re-

quire a new trial every time a juror has been placed in a potentially compromising situation, ... [d]ue process [does require] a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982).

There is no claim of actual juror bias in this case. Instead, the defendants assert that a presumed or implied bias existed. While "[t]he Supreme Court has never explicitly adopted or rejected the doctrine of implied bias," *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir.1990), we have applied this doctrine in certain rare occasions. *See Eubanks*, 591 F.2d at 517 (in heroin case, presumed bias where juror's two sons were serving sentences for heroin-related crimes); *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir.1977) (noting, in a bank robbery case, presumed bias "is evident when the prospective jurors work for the bank that has been robbed"); *see also Smith*, 455 U.S. at 221–24, 102 S.Ct. at 948–50 (O'Connor, J., concurring) (supporting doctrine of implied juror bias). Generally, however, "[o]nly in 'extreme' or 'extraordinary' cases should bias be presumed." *Tinsley*, 895 F.2d at 527 (citation omitted).

The issue as consistently framed under our case law, is whether "this case present[s] a relationship in which the 'potential for substantial emotional involvement, adversely affecting impartiality,' is inherent?" *Tinsley*, 895 F.2d at 527 (quoting *Eubanks*, 591 F.2d at 517; *Allsup*, 566 F.2d at 71); *see also United States v. Panza*, 612 F.2d 432, 441 (9th Cir.1979), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3019, 65 L.Ed.2d 1118 (1980).

Plache and Attarian assert that Coleman had an implied bias because (1) use of the mails was the basis for jurisdiction; (2) Coleman would allegedly identify with the Postal Inspection Service, which was the investigating agency for part of the case, since Coleman "performed the actual delivery of the mail;" (3) "the Postal Service [was] a victim in that the services of mail carriers such as Ms. Coleman are being misused;" and (4) Coleman would "probabl[y] support, beyond that of a regular citizen, ... the goals of the mail fraud statute, and [she had an alleged] natural abhorrence against possibly being made an unwilling instrument of mail fraud."

The district court did not abuse its discretion in denying the motions to excuse for cause or for a new trial. The potential for substantial emotional involvement, identified in other cases finding an implied bias, has not been shown here. In the absence of any persuasive additional factors, Coleman's employment status alone does not warrant a finding of implied bias. Here, the credibility of any postal official was never in issue. No Postal Service inspector or employee testified, although a Postal Service inspector sat at the Government's table throughout the trial.

The mere use of the mails as an instrumentality did not convert the Postal Service into a victim, as the defendants contend. No direct relation has been established between Coleman's letter-carrying duties and the investigative function of the Postal Inspection Service.

### III. *Motion to Sever*

■ Plache contends the district court's denial of his three motions to sever, pursuant to Fed.R.Crim.P. 14, constituted an abuse of discretion. *See, e.g., United States v. Patterson*, 819 F.2d 1495, 1501 (9th Cir.1987). The first motion was brought before trial, the second early in the trial, and the third at the close of the Government's case in chief. Generally, to prevail, a defendant has the burden to show he was denied a fair trial in that his joinder was "so manifestly prejudicial that it outweighed the dominant concern with judicial economy." *Id.* at 1502 (citations omitted).

However, it is unnecessary to address the merits because Plache did not renew his motion to sever at the close of all trial evidence. Failure to do so generally waives appellate review. *See, e.g., United States v. Free*, 841 F.2d 321, 324 (9th Cir.),

*cert. denied,* 486 U.S. 1046, 108 S.Ct. 2042, 100 L.Ed.2d 626 (1988). In *United States v. Kaplan,* 554 F.2d 958, 965 (9th Cir.) (cited in *Free,* 841 F.2d at 324), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977), we identified two exceptions to the requirement of renewal to preserve appellate review: "[1] the motion accompanies the introduction of evidence deemed prejudicial and [2] a renewal at the close of all evidence would constitute an unnecessary formality." Neither of these two exceptions has been shown to apply here.

Without any supporting authority, Plache contends this issue was not waived because he renewed a motion to sever at the close of the Government's case in chief. This is not the law of our circuit. *See, e.g., United States v. Figueroa–Paz,* 468 F.2d 1055, 1057 (9th Cir.1972) (where motion to sever was brought pretrial and at the conclusion of the Government's case, waiver results where motion was not renewed "based on prejudice, at the close of all the evidence").

The renewal requirement serves at least two functions. First, it enables the trial court to assess more accurately whether a joinder is prejudicial at a time when the evidence is fully developed. *Free,* 841 F.2d at 324. Second, it prevents any effort to sandbag the trial court by allowing the case to go to the jury, while preserving an issue on appeal based on evidence that was not before the court at the time of its ruling. *Id.; see also Kaplan,* 554 F.2d at 966 ("Premature motions to sever not diligently pursued as the prejudicial evidence unfolds cannot serve as insurance against an adverse verdict."). Plache's failure to renew his motion deprived the court of an opportunity to rule based on all the evidence. Therefore, Plache has waived this issue for appeal.

---

**1.** We have noted that the following elements must be established for the privilege:
  (1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance perma-

## IV. Attorney–Client Privilege

■ Plache and Attarian present separate challenges under the attorney-client privilege. The party asserting the privilege has the burden to prove the privilege applies. *United States v. Layton,* 855 F.2d 1388, 1406 (9th Cir.1988), *cert. denied,* 489 U.S. 1046, 109 S.Ct. 1178, 103 L.Ed.2d 244 (1989); *United States v. Landof,* 591 F.2d 36, 38 (9th Cir.1978).[1] The attorney-client privilege is strictly construed. *Weil v. Investment/Indicators, Research & Management, Inc.,* 647 F.2d 18, 24 (9th Cir.1981). The privilege may be waived by voluntary disclosure. *Clady v. County of Los Angeles,* 770 F.2d 1421, 1433 (9th Cir.1985) (citing *Weil,* 647 F.2d at 24), *cert. denied,* 475 U.S. 1109, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986). Whether the privilege has been waived is reviewed *de novo. United States v. Mendelsohn,* 896 F.2d 1183, 1188 (9th Cir.1990). *See also Dole v. Milonas,* 889 F.2d 885, 888–89 (9th Cir.1989) (mixed question of law and fact).

### A. Plache

■ Plache sought to suppress the testimony of an attorney, Michael Lipman, with whom he had consulted on several occasions about the ELMAS Program. Lipman was allowed to testify that the ELMAS Program was selling non-exempt securities that needed to be registered before they could lawfully be sold. Lipman further testified that he told Plache that he could not continue representing him unless Plache agreed immediately to cease promoting the ELMAS Program. Plache contends that the allowance of this testimony was error because it violated his attorney-client privilege. The Government responds that he waived the privilege by testifying about Lipman's advice before the grand jury. Plache contends he was tricked into doing so.

In his appearance before the grand jury, Plache was asked what he did after he

nently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived....
*Landof,* 591 F.2d at 38 (quoting 8 Wigmore, *Evidence,* § 2292 (McNaughton Rev.1961)). *See also Matter of Fischel,* 557 F.2d 209, 211 (9th Cir.1977).

received a questionnaire from the SEC inquiring about the ELMAS Program. He responded:

> I immediately took it to Jim Attarian and sought his counsel as to what would be the proper way to handle this, and he said to go and find an attorney. And so I found an attorney in San Diego with the law firm of Finley & Kumble, and his name was Michael Lipman. I met him several times and he expressed concern about the concept of this being an exempt security. I returned and shared those thoughts with Jim Attarian, and his response was that because Michael Lipman had been, I think, a U.S. Attorney—anyway, working for the government in some area—that he had a narrow, slanted prejudiced view and that he would recommend using Russell Smith.

It was at this point that Plache waived his attorney-client privilege. Plache contends that the Government tricked him into waiving the privilege when the Government attorney stated "I don't want to get into an attorney-client privilege. I'm interested really in what you told Attarian rather than what Lipman told you as far as a legal consultation." Plache's immediate response was "[i]t was basically that Mr. Lipman felt that the investor groups, as ELMAS [had] wanted them set up, would not meet the Regulation D, I think that's what it is, Reg. D, for an exempt security."

In the context of this questioning, we conclude that there was no trickery involved to invoke this testimony. The Government sought to avoid his testifying further about what Lipman told him, but rather to concentrate on what he told Attarian. Plache's answer simply did not heed the Government's attorney's advice. In any event, the earlier statement had already resulted in a waiver of the privilege. The Government's statement, of which Plache complains, had nothing to do with the initial waiver.

Plache also contends under the circumstances any disclosure was inadvertent. However, we have noted that " 'inadvertence' of disclosure does not as a matter of law prevent the occurrence of waiver," *Weil*, 647 F.2d at 24, and is only one factor to be considered. *Clady*, 770 F.2d at 1433. Plache's disclosure, in any event, was not inadvertent. He purposefully testified about what Lipman had told him.[2]

█ Plache asserts waiver is unwarranted because he was unrepresented before the grand jury and he was compelled to respond to the Government questioning by way of a grand jury subpoena. While a counsel for a grand jury witness may not be present in the grand jury room, Plache was advised of his right to consult with an attorney waiting outside the grand jury room during the proceedings. *See United States v. Mandujano*, 425 U.S. 564, 581, 96 S.Ct. 1768, 1778–79, 48 L.Ed.2d 212 (1976). Although Plache indicated he understood this right, he declined to exercise this right. The Government did not ask any questions directed to Plache's conversations with counsel.

Under the circumstances, we conclude the district court properly found that Plache voluntarily disclosed his privileged attorney communication, thereby waiving the privilege on all other communications on the same subject. *Weil*, 647 F.2d at 25.

## B. Attarian

█ Attarian appeals the denial of his motion to dismiss or in the alternative to suppress evidence based on the attorney-client privilege. The district court denied the motion because Attarian had failed to

---

**2.** The inadvertence cases cited by Plache are distinguishable in that they involved the inadvertent exchange of documents or tapes and not testimonial disclosures, as here. *See Transamerica Computer Co., Inc. v. IBM Corp.*, 573 F.2d 646, 652 (9th Cir.1978) (inadvertent inclusion of privileged documents under an accelerated document inspection program of 17 million documents did not constitute waiver). Moreover, a second case cited by Plache has recently been reversed. *United States v. Zolin*, 809 F.2d 1411, 1417 (9th Cir.1987) (church secretary's delivery of tapes containing privileged communications "under mistaken impression that they were blank ... was sufficiently involuntary and inadvertent as to be inconsistent with a theory of waiver"), *amended in part*, 842 F.2d 1135, & 850 F.2d 610 (9th Cir.1988) (en banc), *aff'd in part and vacated in part*, — U.S. ——, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), *rev'd and remanded*, 905 F.2d 1344 (9th Cir. 1990).

establish an attorney-client relationship. Attarian brought the motion contending that the communications he had with attorneys in the Finley firm and the accounting firm of Arthur Young and Company, which had been retained by the Finley firm, were privileged.

A review of the facts shows that Attarian is not protected by the privilege. On March 25, 1985, Attarian retained the Finley firm on behalf of ELMAS/Republic Overseas Bank, Ltd. ("ROBL") and their affiliates and subsidiaries as a result of pending and threatened regulatory proceedings. The declarations of Finley partners, which were submitted in opposition to the motion before the district court, made clear that the firm was representing the corporate entities and not Attarian individually.

Prior to the instant action, the corporation was placed in receivership. Because the privilege was held by the corporation, any right to assert the attorney-client privilege on behalf of the corporation passed when the receiver of ELMAS/ROBL and its affiliates and subsidiaries, was appointed by the court. *See, e.g., Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 349, 105 S.Ct. 1986, 1991, 85 L.Ed.2d 372 (1985) ("Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties."); *accord Citibank, N.A. v. Andros,* 666 F.2d 1192, 1195 (8th Cir.1981). Therefore, any privilege held by the corporation was not Attarian's to assert.

## V. *Sufficiency of the Evidence*

■ Plache challenges the sufficiency of the evidence, contending the evidence did not show he formed the specific intent to defraud, a required element of mail fraud, pursuant to 18 U.S.C. § 1341 (1988). *See, e.g., Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc.,* 806 F.2d 1393, 1399–1400 (9th Cir.1986). The sufficiency of the evidence is reviewed in the light most favorable to the Government to determine whether *"any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

For purposes of section 1341, specific intent is established by "the existence of a scheme which was 'reasonably calculated to deceive persons of ordinary prudence and comprehension,' and this intention is shown by examining the scheme itself." *United States v. Green,* 745 F.2d 1205, 1207 (9th Cir.1984) (quoting *United States v. Bohonus,* 628 F.2d 1167, 1172 (9th Cir.), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980)), *cert. denied,* 474 U.S. 925, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985). Intent to defraud may be established by circumstantial evidence. *See, e.g., United States v. Cloud,* 872 F.2d 846, 852 n. 6 (9th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989); *United States v. Kessi,* 868 F.2d 1097, 1104 (9th Cir.1989).

Plache argues that the evidence merely showed he was an enthusiastic and successful salesman in promoting the ELMAS program and was unaware of the fraudulent intent of Attarian and others who controlled ELMAS activities. In support, Plache primarily cites *United States v. Pearlstein,* 576 F.2d 531, 538–43 (3d Cir. 1978), where salesmen were charged with mail fraud in a scheme concerning direct-mail-marketing of pens. The convictions there were reversed because the evidence failed to support any knowledge by the salesmen of the false and misleading nature of the scheme or that the salesmen had been privy to the managerial aspects of the scheme. *Id.* at 543.

However, as indicative of the requisite fraudulent intent, the evidence showed that Plache made misrepresentations that the ELMAS Program was not required to be registered as a security with federal or state authorities. Plache sought the legal advice of Lipman on this question, who advised that, in his opinion, the program was not exempt from registration. Lipman told Plache the Finley firm would discontinue representing him unless Plache ceased promoting the program until the matter could be resolved. Subsequently, Plache retained new counsel and terminated Lip-

man's services. Additionally, Plache had been served with a preliminary injunction by the California Department of Corporations, enjoining codefendants Attarian and Smith, *inter alia,* "and all persons acting in concert or participating with them" from promoting the ELMAS Program. The Department then brought a contempt action against Plache and others for violating the injunction by continuing to offer the ELMAS Program. Plache and others were found in contempt, following a trial. This circumstantial evidence was more than sufficient to establish the specific intent element.

VI. *Special Assessment*

Attarian challenges the sentencing court's imposition of a special assessment of $1,250 under 18 U.S.C. § 3013 (1988). The Supreme Court recently upheld such special assessments. *United States v. Munoz-Florez,* —— U.S. ——, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990).

AFFIRMED.