**UNITED STATES of America, Plaintiff–Appellee–Cross–Appellant,**

v.

**Curtis R. MARTIN, Jr., Defendant–Appellant–Cross–Appellee.**

**Nos. 00–10443, 00–10607.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 2001.

Filed Jan. 29, 2002.

Amended on Denial of Rehearing March 13, 2002.

---

**33.** *McIver,* 186 F.3d at 1130 (internal quotation marks and citations omitted).

Bruce Locke, Moss & Locke, Sacramento, California, for defendant-appellant-cross-appellee.

R. Steven Lapham, Assistant United States Attorney, for plaintiff-appellee-cross-appellant.

Before: CANBY, GRABER, and PAEZ, Circuit Judges.

GRABER, Circuit Judge.

Defendant Curtis R. Martin, Jr., entered a conditional guilty plea to one count each of mail fraud, 18 U.S.C. § 1341; wire fraud, 18 U.S.C. § 1343; interstate transportation of stolen property, 18 U.S.C. § 2314; and money laundering, 18 U.S.C. § 1957. In his plea agreement, Defendant reserved the right to appeal his sentence and the denial of his motion to suppress.

Defendant had moved to suppress all the government's evidence, arguing that it was obtained "in violation of his right to privacy in his relationship with his attorney." On appeal from the denial of that motion, he makes the same assertion.

Defendant also challenges his sentence, arguing that (1) the district court improperly grouped his mail fraud and money laundering counts separately; (2) the court abused its discretion by departing upward one criminal history category and two guideline levels; (3) *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), applies to his case; (4) the district court judge should have recused himself because of comments that the judge made during the sentencing hearing; and (5) the district court erred in ordering that restitution was payable immediately.

The government cross-appeals with respect to the sentence. The government contends that the district court abused its discretion by applying an enhancement for "role in the offense" under U.S.S.G. § 3B1.1 to only the money laundering offense but not also for the fraud offenses.

We affirm the district court's denial of the motion to suppress. We vacate the sentence and remand for resentencing because the district court erred in departing upward two offense levels to reflect Defendant's likelihood of recidivism. At the time Defendant was sentenced, the district court correctly grouped the money laundering and fraud offenses separately. Due to an amendment to the Sentencing Guidelines, the district court may conclude on resentencing that Defendant's money laundering and fraud offenses should be grouped together. If (but only if) the counts remain separately grouped on resentencing, we agree with the government that the leadership enhancement should apply to both the money laundering and the fraud counts.

## FACTS AND PROCEDURAL HISTORY

### A. *The Fraudulent Scheme*

In April of 1998, Curtis R. Martin, Jr., set up a company called CCM Capital (CCM). He had determined through library research that this was the name of a subsidiary of Mingly, a large Hong Kong corporation. The .real CCM Capital had no employees and no offices in the United States. Martin filed a false report with Dun & Bradstreet, stating that the CCM that he had incorporated was the Mingly subsidiary. He rented office space in downtown Sacramento and began actively promoting his company as an arm of the Hong Kong corporation.

Martin posed as the Chief Financial Officer of CCM; his co-defendant, William Yu, served as the Senior Vice President. Martin signed documents using the name "Michael Nock," a Senior Vice President of the actual CCM Capital. Yu signed documents as "Lam Yu," another actual officer of the legitimate CCM Capital. On other occasions, William Yu held himself out as the nephew of Lam Yu. Another co-defendant, Justina Cheung, posed as "Kim Wong," a CPA for Deloitte Touche Tohmatso, the real CCM Capital's controller. Cheung frequently distributed actual Mingly financial reports by fax and mail in order to perpetuate the bogus CCM.

In July of 1998, Martin—posing as Michael Nock—secured a $2 million line of credit on CCM's behalf from IBM Credit Corporation. He used this line of credit to enter into eight contracts to lease computer equipment from Inacomp Computer Center (Inacomp), purportedly for Mingly's fictional United States operations. Instead, Martin, Cheung, and Yu sold the computer equipment to retailers in the

United States and Canada. The computers were shipped in interstate commerce to the purchasers.

Martin also admitted to securing an additional $1.85 million in computers from Inacomp. He provided post-dated checks for this transaction with a false Wells Fargo Bank Guarantee. Martin met with a co-defendant, fugitive Vladimir Slov, to discuss a deal to sell $3.9 million in computers to Slov's company. This deal included the $1.85 million in computers that Martin already had obtained falsely; the rest did not exist. By providing bogus serial numbers for these nonexistent computers, Martin and Slov obtained $2 million in cash from lines of credit to Slov's company. Part of the funds from this transaction support the money laundering count.

## B. *Martin's Relationship With Lawyer Robert Wilson*

In late spring of 1998, Martin met lawyer Robert Wilson. Wilson was a former criminal defense lawyer who had a law practice on the same floor as Martin's CCM offices. In the summer of 1998, Martin and Wilson began discussions about Wilson's possible employment as general counsel for CCM. They agreed that Wilson would be put on retainer for CCM beginning September 1, 1998. Wilson moved his offices into the CCM suite on October 1, 1998, and formally became counsel for CCM on or about November 1, 1998.

During his talks with Martin about becoming CCM's lawyer, Wilson wrote a letter for Martin challenging a mechanic's lien. Over the course of his employment at CCM, he performed additional small-scale legal work for Martin. For example, he provided blank forms in connection with a landscaping project. He reported a stolen truck. Also, he consulted on a real estate transaction that involved both Martin personally and CCM. Martin was going through a divorce, and Wilson may have referred him to a family lawyer in that matter.

On March 4, 1999, a representative of Wells Fargo Bank called Wilson and told him that the bank would not be doing any further business with CCM because of a problem with one of CCM's officers. Later that morning, a representative of Ernst & Young called Wilson to say that Ernst & Young was also disassociating itself from the company based on a background check on Martin. The background check, or "Scherzer Report," stated that Curtis R. Martin, Jr., had served five years in San Quentin for grand theft, receiving stolen property, and attempted grand theft.

Wilson contacted acquaintances in the local United States Attorney's Office in an effort to confirm that the Curtis R. Martin, Jr., named in the Scherzer Report was the same person as the Curtis Martin who worked for CCM. Later that day, Wilson was to fly to Arizona to attend a meeting with Martin and some prospective business contacts from Bank One, and he was concerned that Martin might be defrauding CCM. At this point, Wilson still believed that he was working for the real CCM, a subsidiary of the Mingly corporation. As general counsel, he considered himself the highest ranking official of the company in the United States, other than Martin.

Wilson brought the Scherzer Report to Assistant United States Attorney (AUSA) Jodi Rafkin. That morning, Rafkin had just completed a meeting with an FBI agent, Dave Hienle. After Wilson told Rafkin about the reason for his visit, she called Hienle back into her office. Later, she also called AUSA Steve Lapham, a member of the office's white-collar crime division, to talk about Martin with Wilson as well. At this meeting, no one asked

Wilson if he had the authority to disclose the background check or whether it was protected by the attorney-client privilege.

Later on March 4, Wilson flew to Arizona, as planned, to meet with Martin and representatives of Bank One. He did not tell Martin about the background check or his visit to the United States Attorney's Office.

After Wilson returned to Sacramento, FBI agent Paul Artley confirmed that the Curtis Martin of CCM was the same person as the Curtis R. Martin, Jr., named in the Scherzer Report. Wilson wrote a letter explaining the situation to the home office of Mingly in Hong Kong, using an address on file in CCM's offices. Unbeknownst to Wilson, the address was that of a mail drop set up by Martin.

On March 7, Wilson phoned Mingly in Hong Kong and determined that the real CCM had no affiliation in the United States. The receptionist with whom he spoke told him that his colleagues had no affiliation with CCM Capital or Mingly. He also determined that the address to which he had sent the Federal Express letter was not affiliated with Mingly or CCM Capital.

The next day, Wilson met again with Lapham, Artley, and other government agents. He told them what he had learned. He also told them that Martin was attempting to obtain various credit lines with banks and private companies. He explained the structure of CCM and the roles played by William Yu and Kim Wong (a/k/a/ Justina Cheung).

Wilson returned to work at CCM. On March 23, Martin confronted Wilson about the reference to the Hong Kong letter on CCM's Federal Express bill. At that point, Wilson resigned.

On March 24, the government executed search warrants on CCM's offices and ar-rested Martin, Cheung, and Yu. On September 17, 1999, a grand jury returned an indictment against the three bogus CCM officers and Vladimir Slov. The indictment charged the four with one count of conspiracy under 18 U.S.C. § 371; 11 counts of mail fraud under 18 U.S.C. § 1341; 14 counts of wire fraud under 18 U.S.C. § 1343; 7 counts of interstate transportation of fraudulently obtained property under 18 U.S.C. § 2314; 40 counts of money laundering under 18 U.S.C. § 1956(a)(1); 17 counts of money transactions in criminally derived property under 18 U.S.C. § 1957; and one count each of false statements under 18 U.S.C. § 1010 and 18 U.S.C. § 1014.

## C. *The Motion to Suppress*

Defendant moved to suppress all the government's evidence on the ground that the investigation was prompted entirely by Wilson's information. Defendant argued that Wilson was both his personal lawyer and his corporate lawyer and that the government improperly had intruded into his attorney-client relationship by meeting with Wilson and using the information that he revealed.

After a two-day hearing, the district court made factual findings and denied the motion to suppress. First, the court found that Wilson had performed legal work for Defendant personally in three "very limited transactions and for very limited purposes." Specifically, Wilson wrote a letter challenging a mechanic's lien, provided blank forms in connection with a buy-sell agreement, and made a phone call to report a stolen truck. The district court determined that the balance of Wilson's legal work was performed for CCM.

The district court also found that Wilson continued to work at CCM after meeting with the United States Attorney's Office and the FBI because he was concerned

about the victims of fraud, whom "he felt that he may have had a part, unwittingly, in injuring." Further, the court found that Wilson was genuinely concerned for his safety and that of his family. The district court found that the FBI did not ask Wilson to remain at CCM. In fact, the district court found that, after March 4, Wilson did not provide any information to the FBI that he had obtained as counsel to either Martin or CCM.

The district court also found that the FBI did not affirmatively send Wilson back to CCM to gather more information. Indeed, according to Wilson—whose testimony the district court credited—the FBI wondered why he remained at the company. Moreover, FBI agents told Wilson not to violate any legal obligation of confidentiality in working with them and not to furnish information that violated a privilege. Agents also advised Wilson that the FBI would not knowingly require him to violate a privilege.

The district court denied the motion to suppress for four alternative reasons. First, the district court held that Martin had not established a personal attorney-client relationship with Wilson. Neither was Wilson the lawyer for the Mingly corporation. Rather, Wilson's client was the *bogus* corporation—if, in fact, he had any client at all. Second, even if Wilson was Martin's lawyer, he never revealed any confidences—either Martin's or CCM's. Third, even if there was an attorney-client relationship, there could be no confidentiality because any communication that Wilson revealed fell within the crime-fraud exception to the attorney-client privilege. Finally, the district court held that, "even if somehow" Wilson could be found to have violated confidences of a client, the government's conduct did not warrant suppression.

After the motion to suppress was denied, Defendant entered into his conditional plea agreement with the government. He pleaded guilty to one count of mail fraud, one count of wire fraud, one count of interstate transportation of fraudulently obtained property, and one count of money transactions in criminally derived property.

### D. *The Sentence*

#### 1. *The Motion to Recuse*

Over the course of the sentencing hearing, which spanned two days and during which Martin testified, the district court became frustrated with Martin and his counsel. In expressing that frustration, the court made remarks concerning Defendant's credibility.

Defendant claimed at sentencing that he had planned to return all the defrauded money through profits made from investments in gas stations. The district court pointed out that Defendant could remember amounts of money and prices "to the penny," but could not remember the names of anyone at the oil companies who might be able to corroborate his story. The court interrupted Defendant's direct testimony:

> THE COURT: Let's stop a minute here. I can listen to this, and I'm not believing anything he says. But just let me point out to you, Mr. Martin, you said that those people from those oil companies were giving you money as a contribution to what? To your high lifestyle? To your apartment? To your overhead at CCM?
>
> MR. LOCKE [Defendant's Counsel]: Objection, your Honor. You're berating—
>
> THE COURT: Badgering the witness.
>
> MR. LOCKE: Yes, you are.

THE COURT: You bet. Because I'm the judge, and I get to badger the witness.

After additional colloquy about the tone of his comments, the judge said:

THE COURT: ... You know something, when I sentence him, I get to use whatever tone I want. So it's just going to come up sooner or later.

One of the functions of sentencing is for the judge to chastise the defendant. Lawyers don't get to do that. Judges do. I can do it now or I can do it later. I'll chastise him in good course when we get to the sentencing. And you can take that up to the Court of Appeals, and if there's something wrong about the judge chastising the defendant, then they can tell me so. In the meantime, I'm adjourning this hearing because you're finished. Right?

The court then allowed defense counsel to finish examining Defendant, after which the hearing was adjourned for the day. The next morning, defense counsel moved for recusal. He argued that the judge had cut off the government's opportunity to cross-examine Defendant and that the judge had implied that he thought Defendant was lying. The judge responded, "I didn't form that opinion until I heard his incredible testimony." He went on to say:

THE COURT: My understanding was there was nothing left other than hearing [the government's] cross, and I didn't need to hear any more cross to make a judgment. As to the purpose of the testimony, the only purpose of [the government's] cross was to cast doubt on his credibility, and you didn't need to go any further. He had no credibility with me based on his direct testimony, which was just a crock of baloney.

Now, that's my finding. If there is more evidence to be presented—I didn't know there was any more evidence to be presented. Mr. Locke said he had no more witnesses to call. So I formed my opinion based upon all the evidence that was there.

I'm just insulted personally by Mr. Locke, and that's probably the reason why I'm willing to even consider his motion. It's distasteful to me when I'm doing my job to be accused of being biased and prejudiced. It's distasteful. I resent it.

So that's why I'm inclined to get off this case. I didn't have to have this hearing. Nine out of ten judges would have gone ahead with the sentencing on the pre-sentence report, but I took a couple of days out to hear this testimony because I'm conscientious enough to try to figure out these sentencing guidelines.

Then to be accused of ... bias and prejudice, I don't like it.

Ultimately, the government prevailed upon the judge to stay on the case, and the motion to recuse was denied.

### 2. The Upward Departures

The probation office determined that Defendant's criminal history score was nine. This placed him in Criminal History Category IV, which includes defendants who score seven, eight, or nine points. U.S.S.G. Sentencing Table, ch. 5, pt. A. The probation office's evaluation did not count five adult convictions for fraud-related offenses, due to their age or to the fact that they were later set aside. These uncounted offenses were: (1) a 1980 conviction for fraudulent use of a credit card; (2) a 1980 conviction for use of a stolen credit card; (3) a 1983 forgery conviction that involved checks stolen from an employer, resulting in a loss of more than $2,000; (4) a 1984 conviction for failing to return or pay for a rental car; and (5) a 1986 conviction for failure to appear with an underly-

ing charge of fraud by check, involving a total loss of more than $3,000.

The district court departed upward one criminal history category, finding that Defendant's criminal history category of IV did not accurately reflect the seriousness of his past criminal conduct. The district court departed upward two offense levels based on Defendant's likelihood of recidivism. This brought Defendant to a Criminal History Category V and an offense level of 30. The court ultimately sentenced Martin to 188 months, the maximum under the Sentencing Guidelines at that category and offense level. *Id.*

### 3. *Grouping and Leadership Enhancement*

Following the law in effect at the time of sentencing, the district judge grouped the money laundering and fraud offenses separately. Even though the district court made a factual finding that Defendant was a leader in *both* the money laundering and the fraud offenses, the court applied the two-point leadership enhancement to only the money laundering count. The court explained that it was applying the adjustment to only the money laundering "out of an abundance of caution" due to the "confusing state of the law on this point."

### 4. *The Sentence Imposed*

The court sentenced Defendant to 60 months, the statutory maximum, for both the mail fraud and wire fraud counts, to be served concurrently up to the 52–month point. The court ordered Defendant to serve consecutively the balance of the sentences, eight months each. The remaining two counts of interstate transportation of stolen property and money laundering carry a statutory maximum of 10 years (or 120 months) each. The court sentenced

Defendant to the maximum for each count, to be served concurrently but consecutive to the mail and wire fraud counts. The ultimate sentence thus matched the top of the guideline range applied to Martin—188 months.[1]

Martin also was ordered to pay restitution of $4,507,302.40 to his victims. On the Judgment form, under "Schedule of Payments," the court checked a box providing that restitution was payable "immediately."

## DISCUSSION

### A. *The Motion to Suppress*

■ We review de novo the denial of a motion to suppress. *United States v. Wright,* 215 F.3d 1020, 1025 (9th Cir.), *cert. denied,* 531 U.S. 969, 121 S.Ct. 406, 148 L.Ed.2d 313 (2000).

The material facts underlying the motion to suppress are largely undisputed. The parties disagree, however, as to the inferences to be drawn from those facts. Defendant contends that Wilson was his personal lawyer; the government argues that CCM was Wilson's client. If there was an attorney-client relationship personal to Defendant, the government argues that there were no confidential communications disclosed or, even if there were, that the crime-fraud exception applies. Complicating the matter further, Defendant pointedly states that the government misunderstands the issue when it casts its arguments in terms of *privilege.* Instead, Defendant claims that the government violated his *expectation of privacy* when it listened to what Wilson had to say.

In so arguing, Defendant relies on *De-Massa v. Nunez,* 770 F.2d 1505 (9th Cir. 1985) (per curiam). In that case, we held that clients have a legitimate expectation

---

1. The Appendix sets out Martin's sentence in the form of a chart.

of privacy in their client files at their lawyer's office. *Id.* at 1506. We so held in the context of a search warrant to examine documents in the lawyer's office. *Id.* at 1506–07. Quoting *Rakas v. Illinois,* 439 U.S. 128, 144 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), we said: " 'Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.' " *DeMassa,* 770 F.2d at 1506.

Defendant seeks to extend the holding of *DeMassa.* He argues that, because he had an expectation of privacy in Wilson's *client files,* he also must have had an expectation of privacy in Wilson's *knowledge.* To analyze that argument, we will examine the law of privilege, which is the source outside the Fourth Amendment that recognizes certain legitimate expectations of privacy in nondocumentary information.

When a private person volunteers information to the government, it generally is not improper for the government to listen and then to investigate on the basis of what it hears. The issue becomes complex only if the person has learned about the crime through some special relationship. If a bank robber boards a bus and confesses his crime to the driver, we would not think it improper if that driver contacted the police. Similarly, if the bank robber tells his barber or his bartender about the crime, we would expect them to come forward. However, if the bank robber enters a confessional and admits his crime to a priest, we would be very surprised if the priest reported him.

Our expectations differ because we value open communication in some relationships more than in others. In order to preserve that openness, the law of privilege ensures that certain communications may not be used against us in court. Safe in that knowledge, we confide in our doctors, unburden ourselves to our spiritual counselors, and speak freely with our lawyers. Our expectation of privacy, in other words, has been embodied in the law of privilege, which protects certain communications.

■ Defendant emphasizes that Wilson's statements should be suppressed *not* because they are legally privileged, but simply because Wilson was his lawyer. We do expect that any confidential communications from Defendant to Wilson for the purpose of obtaining legal advice will not be revealed. We expect this not because of generalized privacy rights, however, but because of the law of privilege. Outside the specific protections afforded by the law of privilege, Defendant's lawyer is like any other citizen who might report a crime to the authorities. Our precedents readily recognize these principles.

■ The fact that a person is a lawyer does not make all communications with that person privileged. *United States v. Chen,* 99 F.3d 1495, 1501 (9th Cir.1996). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Weil v. Inv./Indicators, Research & Mgmt., Inc.* 647 F.2d 18, 24 (9th Cir.1981). Wigmore on Evidence describes the several elements of the privilege this way: (1) When legal advice of any kind is sought (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance, permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be waived. 8 Wigmore, Evidence § 2292, at 554 (McNaughton rev. 1961); *see also United States v. Plache,* 913 F.2d 1375, 1379 n. 1 (9th Cir.1990). The burden is on the party asserting the

privilege to establish all the elements of the privilege. *United States v. Munoz,* 233 F.3d 1117, 1128 (9th Cir.2000).

In this case, the attorney-client privilege does not apply for three reasons.

■■■ *First,* to assert the privilege, Defendant must show that he had an attorney-client relationship with Wilson. Defendant did not present sufficient evidence to establish such a relationship. Wilson was hired as general counsel for a corporation. The corporation's privilege does not extend automatically to Defendant in his individual capacity. *Plache,* 913 F.2d at 1381.[2]

During negotiations for his CCM employment, Wilson performed a few legal tasks for Martin personally. If Wilson served as Martin's personal lawyer, he did so as to two or three minor, discrete matters that predated his work for the sham CCM. These matters had nothing whatsoever to do with the information that Wilson disclosed. The information that Wilson revealed to the government related, at most, only to the purported attorney-client relationship between Wilson and the bogus CCM. That relationship gave rise to no privilege personal to Martin.

■■■ *Second,* Defendant cannot point to any privileged communication that Wilson divulged. A party claiming the privilege must identify specific communications and the grounds supporting the privilege as to each piece of evidence over which

privilege is asserted. *United States v. Osborn,* 561 F.2d 1334, 1339 (9th Cir.1977). Blanket assertions are "extremely disfavored." *Clarke v. Am. Commerce Nat'l Bank,* 974 F.2d 127, 129 (9th Cir.1992). Further, the communication must be between the client and lawyer for the purpose of obtaining legal advice. *Plache,* 913 F.2d at 1379 n. 1.

■■■ The Scherzer Report that sparked the investigation was not such a communication. Rather, Ernst & Young, a third party, gave the Report to Wilson. The Report did not originate with Ernst & Young. The firm's investigator, Scherzer & Company, had prepared it as part of due diligence that Ernst & Young had ordered. The Report contained information about Defendant's prior convictions—a matter of public record.

Similarly, any information disclosed regarding the corporate structure of CCM also could have been obtained from publicly available data. For example, Defendant had filed a report with Dun & Bradstreet.

■■■ *Third,* the subject of the disclosure was not privileged. Even if Wilson was Defendant's personal lawyer and somehow divulged a confidential communication to the government, that communication would not be protected by the privilege because it was subject to the crime-fraud exception.[3]

---

**2.** Defendant hired Wilson as counsel for the entity that Defendant had organized in California. Wilson believed that he was working for the Mingly corporation in Hong Kong; in reality, Mingly did not know that Wilson existed. For our purposes, we need not decide which of the two corporations had an attorney-client relationship with Wilson.

**3.** Defendant argues that California does not allow lawyers to reveal their clients' secrets under any circumstances and that the only option for a California lawyer in Wilson's position is to resign. That may state Califor-

nia law governing a lawyer's conduct. *But see Clarke,* 974 F.2d at 129 ("[i]ssues concerning application of the attorney-client privilege in the adjudication of federal law are governed by federal common law"). We do not decide whether it would have been improper for the government to obtain information through a lawyer's breach of a state-law duty of confidentiality because—as explained above in the text—we cannot conclude that Wilson had any such duty to Martin; Martin did not present sufficient evidence to establish that an attorney-client relationship existed between Wilson and Martin personally.

■ The attorney-client privilege does not extend to communications made to a lawyer to further a criminal purpose. When a lawyer's advice is sought to further a crime or fraud, those communications are not privileged. *United States v. Zolin,* 491 U.S. 554, 563, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). The crime-fraud exception to the attorney-client privilege "assure[s] that the 'seal of secrecy' between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." *Id.* (citations and internal quotation marks omitted).

■ The government bears the burden of proving that the attorney-client privilege does not apply because of the crime-fraud exception. *United States v. Laurins,* 857 F.2d 529, 540 (9th Cir.1988). Demonstrating that the communications with the lawyer were " 'in furtherance of an intended or present illegality and that there is some relationship between the communications and the illegality' " makes a prima facie case. *United States v. Bauer,* 132 F.3d 504, 509 (9th Cir.1997) (quoting *Chen,* 99 F.3d at 1503). It is not enough for the government to have a "sneaking suspicion the client was engaging in or intending to engage in a crime or fraud when it consulted the attorney." *In re Grand Jury Proceedings,* 87 F.3d 377, 381 (9th Cir.1996). The exception applies only when there is "reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme." *Id.* (citation and internal quotation marks omitted).

The district court found that the government had established a prima facie case for application of the crime-fraud exception. We agree.

The sham CCM was created solely to defraud legitimate businesses. Before Defendant hired Wilson, he had already re-searched the real CCM, filed a false Dun & Bradstreet report that listed actual CCM officers as being affiliated with the bogus CCM, and obtained a $2 million line of credit from IBM claiming to be the real CCM. Wilson was hired as CCM's "general counsel" to assist Defendant in continuing the CCM fraud.

■ It does not matter that Wilson was unaware of CCM's criminal purpose or that he took no affirmative step to further that purpose; the *client's* knowledge and intentions control. *Id.* at 381–82. Wilson "need know nothing about the client's ongoing or planned illicit activity for the exception to apply." *Id.* at 382. Communications from Defendant to Wilson simply were not privileged, because Defendant was using Wilson to perpetuate the CCM fraud.

For these three reasons, the district court properly denied Defendant's motion to suppress.

### B. *Sentencing Issues*

#### 1. *The Departures*

##### (a) *Background*

■ A decision to depart from the Sentencing Guidelines is reviewed for abuse of discretion. *United States v. Sablan,* 114 F.3d 913, 916 (9th Cir.1997) (en banc). This standard applies to decisions to depart from a criminal history category. *United States v. Goshea,* 94 F.3d 1361, 1363 (9th Cir.1996). A district court abuses its discretion when it makes an error of law, or when its discretion was guided by erroneous legal conclusions. *Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

■ Congress allows a district court to depart from the applicable guideline range if " 'the court finds that there exists an aggravating or mitigating circumstance of

a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.' " *Koon,* 518 U.S. at 92, 116 S.Ct. 2035 (quoting 18 U.S.C. § 3553(b)). In deciding whether to depart from the guidelines, a district court should first identify what features of the case take it outside the "heartland" of the offense or the prescribed category. *Sablan,* 114 F.3d at 916–17. Next, the court should determine whether departures on those grounds have been forbidden, encouraged, or discouraged by the Sentencing Commission. *Id.*

### (b) *The Criminal History Departure*

Under § 4A1.3 of the Sentencing Guidelines, an upward departure is warranted "when the criminal history category significantly underrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes." "District courts see many more sentencing decisions than appellate courts and thus have a special competence to determine whether a defendant's criminal history is more serious than other defendants in the same category." *Goshea,* 94 F.3d at 1364. The court may consider remote offenses that are "similar" to the crime charged, or "serious dissimilar" conduct. U.S.S.G. § 4A1.2, cmt. n. 8 (2000).

Defendant's uncounted offenses were *both* similar *and* serious. The uncounted offenses also involved fraud, albeit on a scale smaller than the CCM scheme. We have held that "theft of at least $2000 through credit card fraud [and] forgery ... is ... serious and supports horizontal departure." *United States v. Connelly,*

156 F.3d 978, 985 (9th Cir.1998).[4] Two of Defendant's uncounted offenses were for forgery in excess of $2,000. Taken together with the rental car fraud and other credit card frauds, the uncounted conduct is sufficiently serious to be considered in a criminal history departure.

 As it is encouraged to do, the district court compared Defendant's criminal history with the criminal history of others typically in a Criminal History Category IV and determined that the category did not adequately reflect his criminal history. *United States v. Streit,* 962 F.2d 894, 903 (9th Cir.1992). The district court found that Defendant "clearly is not typical of one that we would see with a criminal history category four." Instead, the district court thought that Defendant was "the equivalent of someone that we would ordinarily say is a career criminal with a criminal history category of six." Giving Defendant the "benefit of the doubt," the court departed upward only one level and assigned a criminal history category of five because "that comes closer to reflecting the seriousness of his criminal history." The district court did not abuse its discretion in applying this horizontal departure.

### (c) *The Offense–Level Departure*

 The district court also departed two offense levels based on Defendant's likelihood of recidivism. The court clarified that this vertical departure was based on the likelihood of *future* recidivism, which the court distinguished from the horizontal departure based on his *past* criminal history. However, the likelihood of future recidivism is encouraged as a factor to be considered in assessing wheth-

---

**4.** *Connelly* recognized that there is some uncertainty as to whether uncounted conduct must, as a threshold matter, be serious in order to be considered in deciding whether to depart. 156 F.3d at 984. As in *Connelly,*

because Defendant's conduct was serious enough to meet such a requirement if it exists, we need not and do not resolve this uncertainty.

er a *criminal history score* is inaccurate, not in departing from an offense level.

■ The guidelines recognize that the criminal history category and the offense-level score are to be treated differently. *See Streit,* 962 F.2d at 907 ("The structure of the Sentencing Guidelines makes clear that the factors to be considered in departing from applicable criminal history categories are distinct from those relevant to departing from appropriate offense levels."). "[L]ikelihood" of recidivism is specifically mentioned in § 4A1.3, and in the introductory commentary to part A of chapter 4, entitled "Criminal History," as a factor reflected in the criminal history score. U.S.S.G. § 4A1.3 & ch. 4, pt. A, introductory cmt. (2000). Offense-level departures to reflect an underrepresented criminal history are erroneous. *United States v. Canon,* 66 F.3d 1073, 1079 (9th Cir.1995).

■ District judges are, and should be, afforded great discretion in their decisions to depart. *Koon,* 518 U.S. at 98, 116 S.Ct. 2035. However, when the guidelines have already taken a factor into consideration, departure is not appropriate. 18 U.S.C. § 3553(b). The Sentencing Commission *has* adequately considered the likelihood of recidivism in formulating the guidelines for criminal history categories. The likelihood of recidivism is reflected expressly in the increase of that score. *See* U.S.S.G. ch. 4, pt. A, introductory cmt. (2000) ("To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered.").

■ The district court decided that Defendant is almost certain to offend again. This may be true; to the extent that it is a factual finding, it is supported by the record. However, the appropriate departure is in the criminal history category, not in the offense level. A departure to Criminal History Category VI was recommended in the Presentence Investigation Report. Although the district court wanted to make sure that the departure was "reasonable" and thus left it at a level V, the court was not permitted then to increase the offense level to reflect what it thought was an underrepresented criminal history finding. *Canon,* 66 F.3d at 1079. Accordingly, we must remand for resentencing. The district court may take into account the likelihood of future recidivism in increasing Defendant's criminal history category, but not in increasing the offense level.

2. *Separate Grouping of the Mail Fraud and Money Laundering Offenses*

At the time of sentencing, the district court correctly grouped Defendant's money laundering and fraud offenses separately. Construing subsections 3D1.2(b) and (d) of the guidelines, this court had determined that money laundering and fraud do not involve substantially the same harm and thus should not be grouped together for sentencing. *United States v. Syrax,* 235 F.3d 422, 425–26 (9th Cir.2000), *cert. denied,* 532 U.S. 988, 121 S.Ct. 1639, 149 L.Ed.2d 498 (2001); *United States v. Hanley,* 190 F.3d 1017, 1033 (9th Cir.1999); *United States v. Taylor,* 984 F.2d 298, 303 (9th Cir.1993).

However, between sentencing and appeal, the United States Sentencing Commission completely revamped the guidelines for money laundering, consolidating two sections into one. U.S.S.G. § 2S1.1 (2001). Those amendments address the grouping of money laundering offenses in an application note:

> *Grouping of Multiple Counts.*—In a case in which the defendant is convicted of a count of laundering funds and a

count for the underlying offense from which the laundered funds were derived, the counts shall be grouped pursuant to subsection (c) of § 3D1.2 (Groups of Closely–Related Counts).

U.S.S.G. § 2S1.1 cmt. n. 6 (2001). The Commission explained that the reason for the application note is to resolve a circuit conflict on the issue surrounding grouping under subsections 3D1.2(b) and (d), and the Commission cited our decision in *Hanley* on one side of that conflict. U.S.S.G. supp. to app. C, amend. 634 at 235 (2001).

 The relevant amendments took effect on November 1, 2001. The district court is required to apply the version of the guidelines that is in effect at the time of sentencing, unless to do so would violate the ex post facto clause of the Constitution. *United States v. Steffen*, 251 F.3d 1273, 1277 (9th Cir.2001), *cert. denied*, ── U.S. ──, 122 S.Ct. 660, 151 L.Ed.2d 575, 2001 WL 1398654 (2001).[5] Because we remand for resentencing as to the offense-level departure, the district court must resentence Defendant under the amended guideline.

It would be premature to decide, however, whether Defendant's offenses should be grouped together under the new application note. The district court will have to determine whether the funds that defendant laundered were derived from the conduct supporting the counts of mail fraud, wire fraud, or interstate transportation in stolen goods. We make no determination on that purely factual issue.

3. *Double Counting and the Enhancement for Role in the Offense*

 If the district court determines that Defendant's money laundering and fraud counts should be grouped together under the new application note, Defendant will be sentenced on only one group of offenses. If that is the case, the Government's argument that the leadership enhancement should be applied to both groups will be moot. If, however, the district court determines that the funds laundered were not derived from the conduct supporting one of the three other counts, separate grouping is still appropriate. If that is the case, we agree with the Government that the leadership enhancement properly would apply to both groups.

Although the court found that there was "no question" that Defendant was a leader in *both* the money laundering *and* the fraud offenses, a factual finding that the record supports, it applied the enhancement for "role in the offense" under U.S.S.G. § 3B1.1 to only one offense group. The court was concerned that to do otherwise would constitute impermissible double counting. Relying on *United States v. Calozza*, 125 F.3d 687 (9th Cir. 1987), the court applied the enhancement to only the money laundering group.

 "Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Alexander*, 48 F.3d 1477, 1492 (9th Cir.1995) (citation and internal quotation marks omitted). Following this rule, *Calozza* held that it was error to apply "abuse of trust" and "vulnerable victim" enhancements to *both* money laundering *and* fraud groups. *Calozza*, 125 F.3d at 691. In that case, the money laundered was the same as the money defrauded from the same vulnerable victims, whose trust Calozza had abused. *Id.* at 692. Applying the enhancement to both offense

5. Defendant makes no ex post facto claim.

groups constituted impermissible double counting because the harm had already been accounted for. *Id.*

We distinguished *Calozza* in *Syrax,* 235 F.3d at 428–29, which was decided after the sentencing occurred in this case. *Syrax* held that applying an enhancement under § 3B1.1 for "role in the offense" to both money laundering and fraud counts does not necessarily constitute impermissible double counting. If the conduct supporting the counts is different and does not involve the same wrong or victim, the enhancement properly could be applied to both groups. *Id.* at 429.

The logic of *Syrax* as to double-counting is consistent with the amended guideline. If the funds laundered were derived from an underlying offense, the amended guideline requires that the money laundering count be grouped with the underlying offense count. In that case, the enhancement could apply to only the single group. The grouping itself eliminates any danger of double-counting.

However, if the funds laundered were not derived from one of the underlying offenses, then separate grouping is still appropriate. If separate grouping is appropriate, then a separate assessment can be made as to whether the leadership enhancement applies to one or both groups as *Syrax* directs.

*Syrax's* conclusion is also supported by common sense. A defendant who is a leader as to some conduct but a follower as to other, separate conduct should have a more lenient sentence than a defendant who is a leader as to both kinds of conduct. The leadership enhancement applied to both groups makes that distinction in sentencing possible.

In this case, as in *Syrax,* the court found as a fact that the enhancement should apply to *both* the fraud *and* the money laundering counts. However, the district court—not foreseeing *Syrax*—incorrectly held that *Calozza* foreclosed the application of the enhancement to both offense groups. We therefore vacate the sentence and remand for resentencing.

## C. *Other Issues*

### 1. *The Motion to Recuse*

██ ██ The standard of review for the denial of a motion for recusal is abuse of discretion. *United States v. Wilkerson,* 208 F.3d 794, 797 (9th Cir.2000), *cert. denied,* 531 U.S. 1182, 121 S.Ct. 1164, 148 L.Ed.2d 1023 (2001). Applying that standard, in *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994), the Supreme Court held that, in the absence of some *extrajudicial* source of bias or partiality, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."

██ The district court's comments during sentencing may have been testy, but they do not justify a recusal under *Liteky.* The comments were not based on any extrajudicial source. Rather, the judge's "knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings." *Id.* at 551, 114 S.Ct. 1147. The remarks revealed only the kind of "hostility" to which *Liteky* refers. Therefore, the district court did not abuse its discretion by denying the motion to recuse.

### 2. Apprendi *Issues*

██ Whether the district court violated the constitutional rule established in *Apprendi* is a question of law that we review de novo. *United States v. Nordby,* 225 F.3d 1053, 1058–59 (9th Cir.2000).

 *Apprendi* does not apply to Defendant's case. *Apprendi* expressly excludes recidivism from its scope. Defendant's criminal history need not be proved to a jury beyond a reasonable doubt. *Almendarez–Torres v. United States*, 523 U.S. 224, 249, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998); *United States v. Pacheco–Zepeda*, 234 F.3d 411, 414 (9th Cir.2000), *cert. denied*, 532 U.S. 966, 121 S.Ct. 1503, 149 L.Ed.2d 388 (2001).

### 3. *Restitution*

 The district court did not abuse its discretion by ordering restitution payable immediately. Restitution is mandatory in this case, regardless of Defendant's ability to pay. 18 U.S.C. § 3664(f)(1)(A). Although the statutory scheme allows the court to permit "nominal periodic payments," it does not require them. 18 U.S.C. § 3664(f)(3)(B). Section 3572 of the same title is the general guide for determining the payment terms of restitution obligations. 18 U.S.C. § 3664(f)(2). Immediate repayment is the general rule: "A person sentenced to pay a fine or other monetary penalty, including restitution, shall make such payment immediately, unless, in the interest of justice, the court provides for payment on a date certain or in installments." 18 U.S.C. § 3572(d).

The district court did not err in following the general rule. The court had before it information regarding Defendant's financial resources that it presumably considered and found insufficient to warrant periodic payments. *Cf. United States v. Bachsian*, 4 F.3d 796, 800 (9th Cir.1993) (noting that a reference to information in a presentence report provides a sufficient basis to conclude that the district court discharged its responsibilities under 18 U.S.C. § 3664).

## CONCLUSION

The conviction is AFFIRMED. We VACATE the sentence and REMAND for resentencing in a manner consistent with this opinion.

APPENDIX