Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
February 5, 2018

**2018 CO 9**

**No. 16SA224, In Re 2015–2016 Jefferson County Grand Jury—Privileged Communications and Confidentiality—Crime–Fraud exception—Wiretapping**

A grand jury investigating M.W. and his company I.I. issued a subpoena duces tecum to I.I.'s attorney ordering her to produce all documents related to her representation of I.I. Along with the subpoena, the People served a notice of hearing to determine whether the documents were protected by the attorney–client privilege. In the notice, the People provided wiretap summaries as an offer of proof that the crime–fraud exception to the attorney–client privilege applies. Reasoning that I.I.'s entire endeavor was illegal, the district court ordered all of the attorney–client communications stripped of privilege without reviewing them in camera.

The supreme court holds that a two-step process applies when a party seeks disclosure of attorney–client-privileged documents under the crime–fraud exception. First, before a court may review the privileged documents in camera, it must "require a showing of a factual basis adequate to support a good faith belief by a reasonable person that wrongful conduct sufficient to invoke the crime or fraud exception to the attorney–client privilege has occurred." Caldwell v. Dist. Court, 644 P.2d 26, 33 (Colo. 1982). Second, the court may strip a communication of privilege only upon a showing

of probable cause to believe that (1) the client was committing, or attempting to commit, a crime or fraud and (2) the communication was made in furtherance of the putative crime or fraud. Because the People failed to make such a showing here, the district court abused its discretion in stripping the documents of privilege.

The court also holds that, on the facts here, the district court should have required the People to disclose the applications and authorizations for the intercepts that it provided to support the subpoena under section 16-15-102(9), C.R.S. (2017), of Colorado's wiretap statutes.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2018 CO 9

**Supreme Court Case No. 16SA224**
*Original Proceeding Pursuant to C.A.R. 21*
Jefferson County District Court Case No. 15CR2
Honorable Dennis Hall, Judge

## In Re

2015–2016 Jefferson County Grand Jury,

and concerning grand jury witness Amy Brimah.

## Rule Made Absolute
*en banc*
February 5, 2018

**Attorneys for Petitioner Amy Brimah:**
Richilano Shea LLC
John M. Richilano
Keyonyu X. O'Connell
  *Denver, Colorado*

**Attorneys for Petitioner M.W.:**
McDermott Stuart & Ward LLP
Sean McDermott
  *Denver, Colorado*

**Attorneys for Respondent The People of the State of Colorado:**
Peter A. Weir, District Attorney, First Judicial District
Donna Skinner Reed, Chief Appellate Deputy District Attorney
Lisa Scanga, Deputy District Attorney
  *Golden, Colorado*

**Attorneys for Amicus Curiae Colorado Bar Association:**
Mountain Law Group, LLC
John W. Dunn
  *Vail, Colorado*

Holland & Hart, LLP
Marcy G. Glenn

*Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Defense Lawyers Association:**
Gordon & Rees LLP
John M. Palmeri
John R. Mann
Heather K. Kelly
Megan M. Rose
  *Denver, Colorado*


**Attorneys for Amicus Curiae Colorado District Attorneys' Council:**
Thomas R. Raynes, Executive Director
Timothy Lane, Staff Attorney
  *Denver, Colorado*


**Attorneys for Amicus Curiae Colorado Trial Lawyers Association:**
Haddon, Morgan and Foreman, P.C.
Norman R. Mueller
Rachel A. Bellis
  *Denver, Colorado*

**JUSTICE HOOD** delivered the Opinion of the Court.
**JUSTICE BOATRIGHT** concurs in part and dissents in part, and **JUSTICE COATS** joins in the concurrence in part and dissent in part.

¶1     This original proceeding arises from a grand jury investigation of petitioner M.W. and his company, I.I.  The People suspected that I.I. was manufacturing and distributing a cigarette product illegally sprayed with synthetic cannabinoids.  As part of the grand jury investigation, the People issued a subpoena duces tecum to I.I's attorney Amy Brimah, ordering her to produce all materials related to any representation by her of I.I. and M.W.  The People also requested a hearing, outside the presence of the grand jury and before a judge.

¶2     Brimah and M.W. moved to quash the subpoena, arguing that the materials were protected by the attorney–client privilege.  The People asserted that the crime–fraud exception to the attorney–client privilege applies.  Brimah and M.W. disagreed and countered that the district court judge would at least need to review each document to determine whether to strip any document of its privileged status.

¶3     The district court denied Brimah's and M.W.'s motions.  It declined to review the documents individually and ordered Brimah to produce the requested materials.  Brimah and M.W. petitioned this court for a rule to show cause.  We issued the rule.

¶4     We hold that a two-step process applies when a party seeks disclosure of attorney–client-privileged documents under the crime–fraud exception.  First, before a court may review the privileged documents in camera, it must "require a showing of a factual basis adequate to support a good faith belief by a reasonable person that wrongful conduct sufficient to invoke the crime or fraud exception to the attorney–client privilege has occurred."  Caldwell v. Dist. Court, 644 P.2d 26, 33 (Colo. 1982).  Second, the court may strip a communication of privilege only upon a showing

3

of probable cause to believe that (1) the client was committing, or attempting to commit, a crime or fraud and (2) the communication was made in furtherance of the putative crime or fraud. Because the People failed to make such a showing here, the district court abused its discretion in stripping the documents of privilege.

¶5 Brimah and M.W. also argue that the district court should have required the People to disclose the applications and authorizations for the intercepts on which it premised its subpoena under Colorado's wiretap statute, specifically section 16-15-102(9), C.R.S. (2017). On the facts present here, we agree. Therefore, we reverse the district court on this point as well.

¶6 Accordingly, we make the rule to show cause absolute, and we remand this case to the district court for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶7 In 2014, the People began investigating M.W. and his company, I.I., based on their suspicion that I.I. was manufacturing and distributing a cigarette product, NBT Herbal Cigarettes, illegally laced with synthetic cannabinoids. I.I.'s cigarette-distribution activities waned or even stopped in late 2015 as a result of police intervention, though the timing of this wind-down isn't clear. It is undisputed that, at least by December 2, 2015, when the police executed a search warrant and seized items, I.I.'s distribution of cigarettes had been "substantially curtailed" (as conceded by counsel for the People at a hearing on August 11, 2016).

¶8 On June 25, 2016, the People served Amy Brimah, counsel for I.I., with a subpoena duces tecum, ordering her to appear in court three days later and to produce

4

"[a] copy of any file, whether physical or electronic, that pertains to the representation of [M.W.], [I.I.], and NBT Herbal Cigarettes from February 19, 2013 to the present." The subpoena said, "There will be a hearing on whether these documents are privileged."

¶9 Along with the subpoena, the People served a notice of hearing[1] for the district court to determine whether the crime–fraud exception to the attorney–client privilege applied to communications between M.W. and Brimah. The People identified three categories of privileged materials at issue: (1) emails between M.W. and Brimah, dated between February 19, 2013, and November 4, 2015, that were in the People's possession though unread; (2) intercepted phone communications between M.W. and Brimah that were in the People's possession though unheard; and (3) Brimah's files pertaining to M.W. and I.I., as requested in the subpoena. As "an offer of proof that the crime–fraud exception applies," the People provided summaries of some of M.W.'s phone calls with business associates (not with Brimah) that police had intercepted. The summarized calls had been made on July 14, September 22, and October 1 of 2015.[2]

¶10 Brimah and M.W. filed motions to quash the subpoena, on which the district court held a hearing. According to Brimah and M.W., it was not until that hearing that

[1] Petitioners asserted both in their filings to the trial court and to this court that the notice and subpoena were served together, and, as far as we can tell, the People have never disputed that assertion.

[2] The text of the call summaries provided as the People's offer of proof is attached as Appendix A. The district court quoted two other call summaries in its July 19, 2016 Order re: motion to quash. Those summaries are attached as Appendix B. The content of the appendices is reproduced verbatim—uncorrected, with all emphases and bracketed materials in the originals—except we have substituted "[M.W.]," "[I.I.]," and "[J.S.]" for the actual names of the apparent grand jury targets mentioned in the summaries.

they learned the subpoena was issued as part of a grand jury proceeding. The court set a second hearing, in order to give Brimah and M.W. additional time to formulate their arguments in opposition.

¶11 The People then issued a new subpoena duces tecum, this time clearly identified as a grand jury subpoena. The language of the subpoena changed as well. It required Brimah to appear in court on July 18, 2016, and to produce "any and all documents, books and records and/or files, whether physical, electronic, or other format, that pertains [sic] to the representation of [M.W.], [I.I.], and/or NBT Herbal Cigarettes, including but not limited to contracts, account statements, notices, communications, or other material in your possession."

¶12 Brimah and M.W. again responded with motions to quash. They renewed their objection based on privilege and also asserted that the subpoena was founded on intercepted communications authorized by wiretap orders that the People had failed to disclose to them, in violation of section 16-15-102(9). (Section 16-15-102(9) requires that, before the contents of any intercepted wire, oral, or electronic communication may be admitted in any trial, hearing, or other proceeding in a state court, each party must be furnished with a copy of the application and court order authorizing the interception.)

¶13 The district court denied the motions to quash. Because there was "abundant evidence" Brimah was engaged in routine legal work furthering I.I.'s business and the only business of I.I. was illegal, the court reasoned that the materials sought by the People's subpoena must have been made for the purpose of aiding in the commission of a continuing crime, and therefore were not protected by the

attorney–client privilege.  Under these circumstances, the court considered an in camera review[3] of the subpoenaed materials unnecessary.[4]

¶14    A problem with service of the subpoena prompted repetition of this series of events.  In her new motion to quash, Brimah added the argument that the crime–fraud exception could not apply to any attorney–client communications after I.I.'s cigarette distribution had been curtailed in late 2015.   She pointed out that the crime–fraud exception applies only to communications in furtherance of a <u>continuing or future</u> crime.  Because I.I.'s only activity alleged to be criminal had ceased as a result of government intervention in late 2015, Brimah argued, any communications afterwards could not have been in furtherance of a continuing or future crime.

¶15    Ultimately, the court reiterated its previous order: Because there was no suggestion in the evidence that I.I. engaged in any lawful activity, <u>all</u> of Brimah's materials pertaining to I.I. fell within the crime–fraud exception.  The court once again declined to conduct an in camera review of the subpoenaed materials, because it concluded the materials "ipso facto" fell within the exception.  The court also concluded that section 16-15-102(9) does not pertain to grand jury proceedings.

---

[3] In camera review involves the trial court inspecting documents off the record, often in chambers, so that it can evaluate the application of privilege on a document-by-document basis.  <u>See also</u> <u>In Camera Inspection</u>, <u>Black's Law Dictionary</u> (10th ed. 2014) ("A trial judge's private consideration of the evidence.").

[4] The district court referenced some evidence beyond the call summaries that were quoted in either the People's Notice or the court's order.  It mentioned having reviewed "wiretap affidavits, search warrant affidavits, and 10-day reports," along with "the contents of several telephone conversations involving [M.W.] and others."  The record, such as it is in this interlocutory appeal, does not include these other materials.

¶16    Brimah and M.W. jointly petitioned this court to exercise its original jurisdiction and issue a rule to show cause why their confidential attorney–client communications and files should be disclosed under the crime–fraud exception, and why they are not entitled to disclosure of the wire intercept authorization materials under section 16-15-102(9). We issued the requested rule.

## II. Original Jurisdiction

¶17    We may choose to exercise our original jurisdiction when an ordinary appellate remedy would be inadequate. C.A.R. 21(a)(1). We have done so when a party "is wrongfully required to disclose confidential records, [such that] the damage will occur upon disclosure, regardless of any ruling on appeal." People v. Sisneros, 55 P.3d 797, 799 (Colo. 2002).

¶18    An ordinary appellate remedy would be inadequate here: Once provided to the People and the grand jury, the confidential materials sought by the subpoena cannot be retracted. Accordingly, we choose to exercise our original jurisdiction in this instance.

## III. Analysis

¶19    This case requires us to address two issues: first, the quantum of proof of wrongdoing required to strip documents of the attorney–client privilege under the crime–fraud exception, and second, the applicability of section 16-15-102(9) on these facts. We address each issue in turn below.

## A. The District Court Abused Its Discretion in Declaring All Subpoenaed Documents to Be Subject to the Crime–Fraud Exception Without Conducting In Camera Review

¶20 To address this first issue, we begin by explaining the attorney–client privilege and the crime–fraud exception to the privilege. We then review our precedent concerning the privilege and the exception. We conclude that only a minimal showing of wrongful conduct sufficient to invoke the crime–fraud exception is required before a trial court may order a party to produce ostensibly privileged documents for in camera review, but the party seeking to overcome privilege must meet a more demanding standard before the trial court may strip the documents of privilege. This second standard requires probable cause to believe that (1) the client was committing, or attempting to commit, a crime or fraud and (2) the communication was made in furtherance of the putative crime or fraud. Because the district court stripped the documents of privilege without applying this standard to each communication, it abused its discretion.

### 1. Standard of Review

¶21 We review the district court's ruling here for an abuse of discretion. See People v. Brothers, 2013 CO 31, ¶ 7, 308 P.3d 1213, 1215. Under this standard, we will reverse the district court only if its decision was manifestly arbitrary, unreasonable, or unfair. People v. Hoskins, 2014 CO 70, ¶ 17, 333 P.3d 828, 834.

¶22 A trial court has discretion to order compliance with a grand jury subpoena duces tecum, despite a motion to quash, but in ruling on such a motion the court must ensure that the subpoena does not invade those constitutional rights or testimonial

9

privileges invoked. See Losavio v. Robb, 579 P.2d 1152, 1155 (Colo. 1978). The court may also decline to require compliance if it concludes the subpoena is unreasonable or oppressive (or for other reasons irrelevant here). § 16-5-204(4)(i), C.R.S. (2017) (listing reasons).

## 2. The Attorney–Client Privilege and the Crime–Fraud Exception

¶23 "The attorney–client privilege is the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). The privilege applies to "confidential matters communicated by or to the client in the course of obtaining counsel, advice, or direction with respect to the client's rights or obligations." People v. Madera, 112 P.3d 688, 690 (Colo. 2005) (quoting People v. Lesslie, 24 P.3d 22, 26 (Colo. App. 2000)). In Colorado, our legislature has also embraced this time-honored privilege in section 13-90-107(1) to (1)(b), C.R.S. (2017):

> There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate . . . .
>
> . . . .
>
> An attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment . . . .

This exemption from discovery is "rooted in the principle that candid and open discussion by the client to the attorney without fear of disclosure will promote the orderly administration of justice." A v. Dist. Court, 550 P.2d 315, 324 (Colo. 1976). Because the attorney–client privilege exists for the benefit of the client, it may be waived only by the client. Id. at 323.

10

¶24 Though designed to be sturdy and reliable, this shield of privilege may sometimes be pierced. The crime–fraud exception to the attorney–client privilege "provides that communications between a client and his attorney will not be privileged if they are made for the purpose of aiding the commission of a future crime or of a present continuing crime." Id. at 324. The crime–fraud exception applies only when the client knows or reasonably should know that the attorney's advice is sought for a wrongful purpose. Caldwell, 644 P.2d at 33. The United States Supreme Court has explained the limitation on the exception as follows:

> The attorney–client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection—the centrality of open client and attorney communication to the proper functioning of our adversary system of justice—ceases to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing, but to future wrongdoing.

United States v. Zolin, 491 U.S. 554, 562–63 (1989) (quotations, citations, and alterations omitted). However, the attorney's knowledge of, or participation in, any wrongdoing is not necessary for the exception to apply. Caldwell, 644 P.2d at 33.

¶25 The party seeking to overcome the attorney–client privilege has the burden of establishing that the crime–fraud exception applies. Id. at 32. But we have not yet specified the exact quantum of proof required to meet that burden.

¶26 Over forty years ago, in A v. District Court, this court established that a trial court may strip a document of its privilege and admit it into evidence when there is a "prima facie showing" that the crime–fraud exception applies to the document. 550 P.2d at 326. We explained that requiring a prima facie showing in this context was not

11

the equivalent of requiring proof of a prima facie case of a criminal charge; instead "there must have been some foundation in fact" for the charge being investigated by the grand jury. Id. at 325.

¶27 Still, we noted that this prima facie showing is not required before the trial court may order a document produced for in camera inspection. Id. at 326. Therefore, we essentially created a two-step process for determining if the crime–fraud exception applies: first, there must be some threshold showing before a trial court can order a document produced for in camera inspection; and second, a prima facie showing must be made before the court can ultimately conclude that the crime–fraud exception applies.

¶28 We elaborated on the first step in Caldwell v. District Court, explaining that before the trial court can order the production of documents for an in camera review, it should "require a showing of a factual basis adequate to support a good faith belief by a reasonable person that wrongful conduct sufficient to invoke the crime or fraud exception" has occurred. 644 P.2d at 33; accord Zolin, 491 U.S. at 572 (noting "a lesser evidentiary showing is needed to trigger in camera review than is required ultimately to overcome the privilege").

¶29 But when it comes to the second step—the "prima facie showing"—we have been less than clear regarding what is required before a trial court may strip a document of privilege. While we have stated that a prima facie showing requires some foundation in fact for the charge at issue, A v. Dist. Court, 550 P.2d at 325, we have not further elaborated on what "some foundation in fact" should look like.

¶30     Brimah and M.W. urge us to do so in this case. Specifically, they ask us to adopt the standard suggested by a division of the court of appeals in People v. Tucker, 232 P.3d 194 (Colo. App. 2009). There, the division noted that other jurisdictions have held that "the party seeking to invoke the crime–fraud exception must at least demonstrate probable cause to believe that a crime or fraud has been attempted or committed and that the communication was in furtherance thereof." Id. at 200 (emphasis added).

¶31     This standard has been adopted by a handful of the federal circuit courts of appeals. See, e.g., In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995) ("We have recently reiterated that a party seeking to invoke the crime–fraud exception must at least demonstrate that there is probable cause to believe that a crime or fraud has been attempted or committed and that the communications were in furtherance thereof." (emphasis added)); In re Antitrust Grand Jury, 805 F.2d 155, 165–66 (6th Cir. 1986) ("We are persuaded by the Second Circuit's [probable cause standard] and adopt it as our evidentiary standard of a prima facie showing.").

¶32     Of course, this probable cause requirement considers only whether the crime–fraud exception applies and thus differs in at least three ways from the probable cause required to indict. See In re Antitrust Grand Jury, 805 F.2d at 167. First, unlike probable cause to indict, which is a showing that a crime has been committed, probable cause for the first element of the crime–fraud exception (that a crime or fraud was being committed or attempted, as opposed to the second element that the communication be in furtherance of the crime/fraud) could be established by showing merely that a fraud

13

was being attempted.  See In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1039 (2d Cir. 1984).  Second, probable cause for an indictment requires only a showing of (criminal) wrongdoing, whereas probable cause for the crime–fraud exception requires an additional showing that the communication was in furtherance of the wrongdoing.  Id.  Third, indictments and the crime–fraud exception involve wrongdoing in potentially different timeframes.  An indictment is for an already-committed crime, dating as far back as the statute of limitations will allow.  But the crime–fraud exception must be for wrongdoing that, at the time of the communication, was continuing or in the future.

¶33     Other circuits apply a similarly demanding "reasonable cause" or "reasonable basis" standard.  See, e.g., In re Grand Jury Proceedings, 417 F.3d 18, 23 (1st Cir. 2005) (adopting the "reasonable cause" standard, which requires a "reasonable basis to believe that the lawyer's services were used by the client to foster a crime or fraud" in order to overcome the privilege); United States v. Martin, 278 F.3d 988, 1001 (9th Cir. 2002) ("The [crime–fraud] exception applies only when there is 'reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme.'" (quoting In re Grand Jury Proceedings, 87 F.3d 377, 381 (9th Cir. 1996))); see also In re Grand Jury, 705 F.3d 133, 153 (3d Cir. 2012) ("Where there is a reasonable basis to suspect that the privilege holder was committing or intending to commit a crime or fraud and that the attorney–client communications or attorney work product were used in furtherance of the alleged crime or fraud, this is enough to break the privilege.").

¶34 Some circuits conclude that the exception may apply with even less proof that the client's communications with the attorney were made to further some crime or fraud. One finds proof of only a "close relationship" between the communications and the possible criminal activity sufficient. In re Grand Jury Proceedings #5, 401 F.3d 247, 251 (4th Cir. 2005). Another shifts the burden of proof onto the party asserting the privilege to "come forward with an explanation for the evidence offered against [the privilege]." United States v. Boender, 649 F.3d 650, 655 (7th Cir. 2011) (alteration in original) (quoting United States v. BDO Seidman, LLP, 492 F.3d 806, 818 (7th Cir. 2007)).

¶35 Courts have commented that, in practice, there may be little difference between these various "prima facie" standards. See In re Grand Jury Subpoena Duces Tecum, 731 F.2d at 1039 ("As a practical matter, there is little difference here between the [probable cause test and the prima facie test]."); In re Sealed Case, 754 F.2d 395, 399 n.3 (D.C. Cir. 1985) (same); In re Int'l Sys. & Controls Corp. Secs. Litig., 693 F.2d 1235, 1242 n.11 (5th Cir. 1982) ("We think that while the [probable cause] phraseology is different, its approach was the same."). But the language of the standards suggests otherwise. The "probable cause" and "reasonable cause" or "reasonable basis" standards use more demanding language than the "close relationship" or burden-shifting standards. And we perceive a subtle difference even between the "probable cause" standard and the "reasonable basis to suspect" standard. A "reasonable basis to suspect" calls to mind the "reasonable suspicion" standard of Terry v. Ohio, 392 U.S. 1 (1968), which requires less than probable cause. People v. King, 16 P.3d 807, 813 (Colo. 2001) ("Reasonable

suspicion is both a qualitatively and quantitatively lower standard than probable cause.").

¶36　We believe the probable cause standard advocated by Brimah and M.W. strikes the correct balance between safeguarding the sanctity of the attorney–client relationship and allowing the government to secure evidence of crime or fraud. Although the Court in Zolin did not define the prima facie standard, it did say that the standard requires more than the "good faith belief" threshold for in camera review. 491 U.S. at 572. Variations on the standard more weakly worded than "probable cause" run the risk of blurring with the in camera threshold and thereby contravening Zolin. See In re Green Grand Jury Proceedings, 492 F.3d 976, 983 (8th Cir. 2007) (holding that the probable cause standard comports with Zolin). Further, because the probable cause standard is familiar, cf. People v. Hearty, 644 P.2d 302, 309 (Colo. 1982) (referring to the "familiar threshold standard of probable cause" in the context of a seizure (quoting Dunaway v. New York, 442 U.S. 200, 213 (1979))), it should prove workable.

¶37　Thus, a party seeking to invoke the crime–fraud exception and defeat the attorney–client privilege in Colorado must do so as follows. First, the party must make a threshold showing of facts adequate to support a good faith belief by a reasonable person that wrongful conduct sufficient to invoke the exception has occurred. If this initial, minimal showing is made, the trial court may, at its discretion, order the production of documents for in camera review. Second, to ultimately decide that a document in question should be stripped of privilege, a higher burden must be met: The party seeking to defeat the privilege must demonstrate probable cause to believe

16

that a crime or fraud was being attempted or committed and that the communication was made in furtherance of the crime or fraud.

¶38    We now apply this standard to this case.

### 3.  Application

¶39    The district court reasoned that because there was overwhelming evidence that I.I.'s <u>sole</u> business was illegal, and that Brimah engaged in routine legal work furthering that business, Brimah's files sought by the subpoena were communications made to aid a continuing crime.  The court therefore concluded that all of the documents, even any that were dated after I.I. seemed to have stopped distributing cigarettes in late 2015, fell within the crime–fraud exception.  It stripped them of privilege without conducting an in camera review, and thus without making a communication-by-communication assessment of whether the exception applied.

¶40    The district court's blanket order swept too broadly to comport with the standard we have articulated above.  Although we defer to the trial court's finding that the "sole" purpose of I.I. was illegal, we reject the assumption that every communication between a criminally purposed business's principal and the business's attorney is necessarily in furtherance of a continuing or future crime or fraud.  For example, what if the principal had asked for advice about the legal ramifications of the business's past activity?  This would not fall within the scope of the crime–fraud exception.  Moreover, the subpoena covered communications that occurred even after police seizures had effectively shuttered the allegedly illegal activity, and thus after the crime or fraud upon which the court based its ruling.

17

¶41 In making this blanket ruling, the court relied on <u>Pignatiello v. District Court</u>, 659 P.2d 683 (Colo. 1983). That reliance was misplaced. <u>Pignatiello</u> concerned a grand jury subpoena of unprivileged bank records, so the case turned on the relatively low-stakes questions of relevancy, particularity, and reasonableness, <u>id.</u> at 685—nothing as weighty as attorney–client privilege. Thus, <u>Pignatiello</u> should not have controlled the district court's decision.

¶42 We need not go so far as to say a court may never make a crime–fraud determination about a group of documents without reviewing each page in camera. It is enough to say that the court's generalization here was too broad to meet the standard required to strip documents of privilege.

¶43 The district court must explicitly address whether there is probable cause to believe that each of M.W.'s and I.I.'s communications with Brimah was in furtherance of the alleged manufacturing and distributing of cannabinoids-laced cigarettes. In camera review of Brimah's files could reveal whether such probable cause exists here. <u>In re Antitrust Grand Jury</u>, 805 F.2d at 168 (noting in camera review of documents "could have assisted the court in determining whether" probable cause existed to apply the crime–fraud exception). The district court therefore abused its discretion in stripping the documents of privilege without reviewing them in camera and making the probable cause determination.

## B. The District Court Erred When It Failed to Require Compliance with Section 16-15-102(9)

¶44     Turning to the second issue, we begin with the language of section 16-15-102(9), which requires disclosure of certain documents before a wireless intercept may be admitted at "any trial, hearing, or other proceeding in a state court."  The People argue, based on the legislative history of the analogous federal statute, that this provision does not apply to grand jury proceedings and that the present matter is a grand jury proceeding.  Assuming, without deciding, that the People are correct as to the reach of the statute, we conclude that the statute applies anyway because the present proceeding is not a grand jury proceeding.  It is a state court proceeding ancillary to, but distinct from, a grand jury proceeding.  We therefore reverse the district court's decision to the contrary.

### 1. Standard of Review

¶45     The meaning of "any trial, hearing, or other proceeding in a state court" as used in section 16-15-102(9) is a question of statutory interpretation that this court reviews de novo. See Johnson v. People, 2016 CO 59, ¶ 17, 379 P.3d 323, 326.

¶46     Our primary goal in interpreting a statute is to give effect to the intent of the legislature. Id. We begin this inquiry with the statutory language, giving words and phrases their plain and ordinary meanings. Doubleday v. People, 2016 CO 3, ¶ 19, 364 P.3d 193, 196.  If the language is unambiguous, we enforce it as written. People v. Lente, 2017 CO 74, ¶ 16, 406 P.3d 829, 832.  However, "if the statutory language is susceptible of more than one reasonable interpretation, it is ambiguous and we may

19

apply other rules of statutory interpretation." People v. Diaz, 2015 CO 28, ¶ 13, 347 P.3d 621, 624–25.

## 2. Section 16-15-102(9) Applies to This Case

¶47 Section 16-15-102(9), part of Colorado's wiretap statute, provides that:

> The contents of any intercepted wire, oral, or electronic communication or the evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding in a state court, unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved.

(Emphasis added.)

¶48 When the prosecution chose to submit four wiretap summaries as an offer of proof (set forth in Appendix A to this opinion) in its notice of hearing, it "disclosed" the "contents of . . . [a] wire . . . communication" under the statute. Id. But the parties dispute whether that disclosure occurred within the context of a "hearing . . . or other proceeding in a state court," id. We turn to that question now.

¶49 The district court determined that the language "any trial, hearing, or other proceeding in a state court" in section 16-15-102(9) did not include grand jury proceedings. It therefore concluded that the People were under no obligation to notify Brimah and M.W. before presenting their intercepted conversations at the motion hearing, which the court assumed was a grand jury proceeding. It reached this conclusion based on the legislative history of 18 U.S.C. § 2518(9) (2016), the federal analogue to section 16-15-102(9). The two sections are nearly identical. The Senate Report that accompanied the federal act noted that 18 U.S.C. § 2518(9) "would not

20

include a grand jury hearing." S. Rep. No. 90-1097 (1968), <u>as reprinted in</u> 1968 U.S.C.C.A.N. 2112, 2195. We have previously stated that "[b]ecause Colorado's wiretap statute is closely patterned after and designed to implement the policies of the federal act, federal authorities explaining the federal wiretapping statute should be accorded great weight in interpreting the Colorado statute." <u>People v. Baez-Lopez</u>, 2014 CO 26, ¶ 17, 322 P.3d 924, 928.

¶50 Assuming, without deciding, that section 16-15-102(9) does not apply to grand jury proceedings, we conclude that the section still applies in this case. The present proceeding is not a grand jury proceeding, but rather a hearing that is ancillary to, and distinct from, the grand jury proceeding.

¶51 In <u>P.R. v. District Court</u>, 637 P.2d 346, 350–51 (Colo. 1981), we concluded that a contempt hearing sought by the prosecution—though concerning a witness who refused to testify at a grand jury proceeding—was distinct in form and function from the grand jury proceeding, and therefore that the contempt hearing did not have to be conducted in secret, as the grand jury proceeding did. Whereas a grand jury proceeding is a secret, ex parte proceeding in the presence of a grand jury with an investigative purpose, the contempt hearing at issue in <u>P.R.</u> was a multiparty proceeding outside the presence of the grand jury, sought by the prosecution to adjudicate an issue as to which it shouldered the burden of proof.

¶52 The present situation is analogous. Although the People ultimately wish to present the subpoenaed materials and other communications between Brimah and M.W. to the grand jury, the immediate proceeding involves a multiparty contest outside

21

the grand jury's presence. And like the contempt proceeding in P.R., this hearing was initiated by the prosecution. The prosecution served the subpoena and notice of hearing to adjudicate the applicability of the crime–fraud exception to Brimah's privileged files (an issue as to which the People acknowledge they shoulder the ultimate burden of proof). The present court proceeding thus has a different form and serves a function distinct from the grand jury proceeding itself.

¶53 Thus, we conclude that section 16-15-102(9) applies to the present case and that the district court erred in concluding to the contrary.

¶54 Mindful of the importance of secrecy in grand jury investigations, however, we note some important limits on our decision today. First, the statute comes into play only when the wiretap contents are "received in evidence or otherwise disclosed" in a court proceeding, § 16-15-102(9), which we have assumed does not cover a grand jury proceeding. Neither presentation of wiretap contents to a grand jury nor the filing of a motion to quash a subpoena could trigger the statute because neither places "in evidence or otherwise disclose[s]" wiretap contents in a court proceeding. Here the prosecution triggered the statute when it disclosed wiretap contents by submitting wiretap summaries as an offer of proof in opposition to the motion to quash. So, needless to say, a prosecutor could avoid triggering the statute by avoiding the use of wiretap contents while contesting a motion to quash. Second, this case involved a hearing in court requested by the prosecution, and the prosecution did not argue here that revealing the information required by section 16-15-102(9) would interfere with grand jury secrecy. Thus, we need not, and do not, decide how the statute would apply

(1) in the absence of a hearing in court or (2) if the prosecution opposed a disclosure on the grounds of protecting grand jury secrecy. Third, the prosecution here chose to subpoena privileged documents from Brimah, almost certainly knowing she would resist and the prosecution would have the burden to prove an exception to the privilege. Many subpoenas will not involve the attorney–client privilege, let alone necessitate an adjudicative hearing regarding the crime–fraud exception.

## IV. Conclusion

¶55 We hold that a two-step process applies when a party seeks disclosure of attorney–client-privileged documents under the crime–fraud exception. First, before a court may review the privileged documents in camera, it must "require a showing of a factual basis adequate to support a good faith belief by a reasonable person that wrongful conduct sufficient to invoke the crime or fraud exception to the attorney–client privilege has occurred." Caldwell, 644 P.2d at 33 (Colo. 1982). Second, the court may strip a communication of privilege only upon a showing of probable cause to believe that (1) the client was committing, or attempting to commit, a crime or fraud and (2) the communication was made in furtherance of the putative crime or fraud. Because the People failed to make such a showing here, the district court abused its discretion in stripping the documents of privilege.

¶56 We also hold that section 16-15-102(9) applies to the present proceeding. We therefore reverse the district court's decision that the district attorney is not required to disclose the authorization materials to the defendant before a hearing on the motion to quash.

23

¶57    Accordingly, we make the rule to show cause absolute and we remand this case to the district court for further proceedings consistent with this opinion.

**JUSTICE BOATRIGHT** concurs in part and dissents in part, and **JUSTICE COATS** joins in the concurrence in part and dissent in part.

## APPENDIX A—People's Offer of Proof

Intercepted call from [J.S.] to [M.W.], No. 5429 (September 22, 2015):

[M.W.] mentioned that he had just left Amy Brimah's. [J.S.] then asked [M.W.] what Amy had to say. [M.W.] replied that Amy had not heard anything from Ken Kramer (counsel for Smoker Friendly Corp.) and said that the last thing that Amy heard was that they thought the thing in Havre, Montana was going to blow over. [M.W.] said that he had showed Amy the email that [J.S.] received. [M.W.] stated that Amy had asked if Smoker Friendly had sent over a termination of contract but [M.W.] said that the only thing they had in place was an indemnity agreement . . . [M.W.] went on to say that **Amy had to be very careful with the words that she used. [J.S.] acknowledged and said that they gave Smoker Friendly "plausible deniability."** [J.S.] said that they would say they ran a huge batch and should have run smaller lot numbers and that was their mistake and therefore needed to recall the NBT.

Intercepted call from [M.W.] to Porter, No. 5453 (September 22, 2015):

[M.W.] said he was in the meeting with Amy Brimah and **Amy was going through synthetic cannabinoids cases just to see what's going on out there and that 90% of synthetic cannabinoids cases plead out and take a deal because nobody wants to risk 20 years in jail and cases going to court are getting tossed because the prosecutor cannot prove them**.

Intercepted call from [M.W.] to [J.S.], No. 6210 (October 1, 2015):

[M.W.] said he had just gotten back from **Amy's office and they had talked about the NBT issues. [J.S.] suggested they say that 5-FLORO-AMB was not supposed to be there, they had random occurrences, their attorney looked into it and this is what she had told them**. [M.W.] acknowledged. [J.S.] said then they would introduce that opinion and maybe go back to selling it. [M.W.] replied maybe and added that **they** were working on that **same tactic** for Ohio [seizure of NBT by police]. **[M.W.] stated that he had Amy working on that,** adding that nobody got arrested, the police just seized everything.

Intercepted call—Porter and [M.W.]—No. 1395 (July 14, 2015):

. . . [M.W.] added that even if that [unspecified chemical] was something that was inside the product, it wasn't anything that was going to send Dustin to jail. [M.W.] said that **he had Amy and the lawyers at [U/I] go over it, identify it, and check the federal CSA**. [M.W.] repeated that it was not anything that was going to send somebody to jail. [M.W.] said that the guys at Katz had no criminal charges and that it was civil suit . . . **[M.W.] agreed and said that one of the bigger issues is that they had to be able to**

prove knowledge and intent.  [M.W.] said that a lot of DA's slapped cases on people and were unable to prove it . . . **[M.W.] stated that they had everything set up incase anything were to be caught up, all the roads led back to [M.W.].**

## APPENDIX B — Call Intercepts from Order Re: Motion to Quash

On September 21, 2015 Intercepted Call #5358 had [J.S.] calling [M.W.] to discuss the SMOKER FRIENDLY situation in Montana where the NBT tested positive for 5-FLORO-AMB [synthetic cannabinoids]. The following is a portion of the conversation. **[J.S.] said it was time for Amy [BRIMAH—attorney for [I.I.]] to go to work.** [M.W.] asked what was happening. [J.S.] said he just got off the phone with Tim GREENE and Dan GALLAGHER [SMOKER FRIENDLY CORP]. [J.S.] said they [Tim and Dan] just got their test results back from the product in Havre [Montana] and that it was showing there was 5-FLORO-AMB. [M.W.] acknowledged. [J.S.] said it was the same story. [J.S.] said they [Tim and Dan] pulled the entire product [NBT] off the shelves because it was a banned substance. [J.S.] said he told them [Tim and Dan] that he would call [M.W.] and touch base with them later. [J.S.] said that they [SMOKER FRIENDLY] pulled the product and put it in the back room. [J.S.] said he told them they could return it and they'd get their money back. [M.W.] acknowledged. **[J.S.] asked if Amy [BRIMAH] could call these guys and tell them they were being dumb and that they [Smoker Friendly] needed to get back to work because the stuff wasn't illegal** and all of the insurances were in place.

[M.W.] told [J.S.] he wanted to give him the heads up that Dustin [Utah distributor] was all riled up again, because he [Dustin] had come across on the internet the article [of the raids] regarding the Katz [Tobacco stores] down in Texas. [J.S.] acknowledged. [M.W.] said Dustin had commented that it [NBT tested positive for 5-FLORO-AMB] was confirmed.
[. . .]
[M.W.] stated that he [Dustin] needed to get his money back. [M.W.] said he told him [Dustin] that his stuff had to get here [Colorado] first before a credit could be issued, but that he [Dustin] had 40 grand [$40,000] in invoices that he [Dustin] never paid. [J.S.] agreed and said that he [Dustin] should shut his mouth up until they [[M.W.] and [J.S.]] get it balanced out first. [M.W.] said it would credit against that, and whatever was left from that, he [M.W.] would cut him [ Dustin] a check for that. **[J.S.] affirmed and asked if Amy [BRIMAH-*Attorney*] could advise him [Dustin] to keep his mouth shut.** [M.W.] told [J.S.] he didn't know and would have to talk to her [Amy] but she [Amy] had some things to do with the kids this afternoon so [M.W.] would have to talk to her about it tomorrow. [J.S.] affirmed

[quoting the call summary of call #421, 6-25-2015]

JUSTICE BOATRIGHT, concurring in part and dissenting in part.

¶58    The majority reaches the remarkable conclusion that a hearing regarding a motion to quash a grand jury subpoena is not a grand jury proceeding.  The majority reaches this conclusion despite the fact that the motion to quash the grand jury subpoena was filed in the grand jury case, to be ruled upon by the judge responsible for the grand jury proceeding, and the determination of will impact the evidence the grand jury would hear.  Hence, I disagree.  In my view, a hearing on an evidentiary question before a grand jury is a part of a grand jury proceeding just like an evidentiary question in a criminal trial is part of the criminal proceeding.  No one would ever argue that a hearing regarding a motion to quash a subpoena in a criminal case is "ancillary to and distinct from" its criminal proceeding.  By concluding that this hearing is separate from the grand jury proceeding, the majority holds that a mandatory disclosure statute applies to this hearing.

¶59    The mandatory disclosure provision in section 16-15-102(9), C.R.S. (2017), has a broad reach that requires extensive disclosure of investigatory materials when used in a covered proceeding.  Section 102(9) mandates disclosure of the "court order and accompanying application" before any "intercepted wire, oral, or electronic communication or the evidence derived therefrom" can be received in evidence or disclosed in "any trial, hearing, or other proceeding."  § 16-15-102(9) (emphasis added).  Today the majority holds that a hearing on a grand jury subpoena is a hearing separate from a grand jury proceeding itself, and is therefore subject to section 102(9)'s disclosure mandate; in so doing, it forces wholesale disclosure of grand jury

1

investigatory materials without a showing of need or relevance, and without inquiring whether disclosure would have deleterious effects on the underlying investigation. This decision impairs the investigative function of the grand jury, which I fear will result in severe, unintended consequences. In my view, current law does not compel such a result. A careful reading of the mandatory disclosure statute and related authority, with thorough consideration of the on-the-ground reality, provides sound basis to hold that a hearing such as the one in this case is part of a grand jury proceeding and is therefore not a section 102(9) hearing subject to mandatory disclosure. While I agree with the majority regarding the treatment of subpoenaed attorney-client communications, I cannot agree that the subpoena hearing is subject to the mandatory disclosure statute, section 102(9). I therefore concur with the majority in part, but respectfully dissent from section III.B.

¶60    Under the majority's decision, virtually every subpoena issued in grand jury investigations utilizing wiretaps or evidence derived therefrom provides a crowbar that the defendant can use to pry open the door to information that law enforcement has obtained and kept confidential throughout its investigation. Going forward, it is easy to envision the clear incentive for defense counsel, even without a likelihood of success, to fight every subpoena. Just by filing a motion to quash, which the prosecution will naturally oppose, the defense will discover previously confidential details of the ongoing investigation. Federal courts have avoided this trap when interpreting the federal version of the mandatory disclosure statute by first, holding that grand jury proceedings are not subject to the virtually identical federal statute governing

mandatory disclosures; and second, when the court determines disclosure is required, utilizing a far more nuanced regime than the majority's broad disclosure requirement announced today. We should follow the federal court precedent.

¶61    I agree with the majority that section 16-15-102(9) is virtually identical to its federal counterpart. Compare § 16-15-102(9), with 18 U.S.C. § 2518(9) (2017). As the majority notes, we afford great deference to federal authority interpreting the wiretap provisions. Maj. op. ¶ 49 (citing People v. Baez-Lopez, 2014 CO 26, ¶ 17, 322 P.3d 924, 928); see also Reg'l Transp. Dist. v. Outdoor Sys., Inc., 34 P.3d 408, 415–17 (Colo. 2001) (interpreting a Colorado statute employing language "essentially identical to that of the Federal Act" with the aid of congressional history and federal judicial interpretations). In its analysis, the majority briefly mentions that the Senate Report on the enacting legislation for § 2518(9), the federal counterpart to section 102, states that its disclosure mandate "would not include a grand jury hearing," maj. op. ¶ 49 (quoting S. Rep. No. 90-1097 (1968), as reprinted in 1968 U.S.C.C.A.N. 2112, 2195), but the majority delves no further into the issue, stating only that it assumed but did not decide that the statute did not apply to grand jury proceedings. Because the federal statute is virtually identical to the Colorado statute, it is worth examining the backdrop against which the federal statute was enacted and how federal courts have approached problems of balancing disclosure against the need for grand jury secrecy and efficiency.

¶62    Grand jury proceedings are different from regular trials. Supreme Court cases decided around the time the federal statute was enacted, and often cited in the accompanying Senate Report, explain at length the need for grand juries to operate

3

apart from the usual procedural rules provided in a full trial. For example, in <u>Costello v. United States</u>, 350 U.S. 359 (1956), the Court rejected the defendant's argument that he should be allowed to challenge an indictment on the grounds that it was not supported by adequate or competent evidence, holding that such a challenge would "run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules." <u>Id.</u> at 364. Thus, in light of a grand jury's limited function, there is a strong preference for limiting review of its actions to preserve confidentiality and efficiency. Such challenges can be better made through motions in limine when and if a defendant is indicted at the conclusion of the grand jury's investigation.[5] In cases where federal courts have been forced to consider disclosure of grand jury proceedings, they have crafted finely graded disclosure regimes designed to balance the integrity of the grand jury's ongoing investigation with the defendant's need for information.

---

[5] In the end, there is no guarantee that a grand jury investigation will result in an indictment. Additionally, allowing motions practice during a grand jury proceeding would impede the efficient use and thwart the purpose of grand juries:

> Permitting witnesses to invoke the exclusionary rule before a grand jury would precipitate adjudication of issues hitherto reserved for the trial on the merits and would delay and disrupt grand jury proceedings. Suppression hearings would halt the orderly progress of an investigation and might necessitate extended litigation of issues only tangentially related to the grand jury's primary objective. The probable result would be protracted interruption of grand jury proceedings, effectively transforming them into preliminary trials on the merits. In some cases the delay might be fatal to the enforcement of the criminal law.

<u>United States v. Calandra</u>, 414 U.S. 338, 349–50 (1974) (citations omitted).

¶63 For example, In re Lochiatto, 497 F.2d 803 (1st Cir. 1974), dealt with contempt proceedings against witnesses for failure to answer questions before a grand jury. The witnesses sought disclosure of the underlying reports and information generated by the grand jury to buttress their Fifth Amendment defense against testifying. See id. at 804–05. In considering the parties' competing concerns, the court balanced the defense's need for the materials to prepare its defense against the government's interest in keeping materials relating to an ongoing investigation confidential. See id. at 806–08. The court devised a multistep process for disclosing law-enforcement-sensitive material. If the government objects to production on secrecy grounds, the district court must determine how to minimize the harmful information disclosed in the materials. See id. at 808. If the material is so sensitive as to be undisclosable in any amount without prejudicing the government, the court may review the material in camera and resolve the challenge itself. See id. Before today, Colorado has similarly tried to balance competing concerns.

¶64 Today the majority rejects these finely graded disclosure regimes by holding that the hearing in this case is a hearing for purposes of section 102(9). Because this hearing is now a hearing under section 102(9), and because this hearing necessarily involves the disclosure of wiretap information to establish the applicability of the crime-fraud exception to attorney-client privilege, the broad and undifferentiated disclosure mandate in section 102(9) applies.

¶65 The majority holds that the present hearing is a section 102(9) hearing by way of strained analogy to this court's decision in P.R. v. District Court, 637 P.2d 346 (Colo.

5

1981), where this court held that a contempt proceeding for a recalcitrant grand jury witness was sufficiently distinct from the grand jury proceeding itself and was, therefore, not automatically a confidential, closed proceeding. Id. at 350. In P.R., however, the court did not hold that a contempt hearing was a section 102(9) hearing. The issue in P.R. was only whether a contempt hearing could be closed to the public. The court examined the prosecution's attempt to close the contempt proceeding to the public to preserve the integrity of the underlying grand jury investigation. Id. at 353. The accused contemnor refused to answer questions before the grand jury and defended on the grounds that the wiretap, which formed the basis of the prosecutor's questioning, was illegal. Id. at 349. This court balanced the parties' competing interests: On one hand, P.R.'s and the public's interest in a public hearing on the contempt issue, and on the other, the need to protect the integrity of the grand jury process by closing the court. This court decided that, before closing the hearing to the public, the district court must (1) find a clear and present danger to the efficacy of the grand jury proceedings, and (2) find that the prejudicial effects cannot be avoided by any reasonable, less drastic alternative. Id. If the majority had just relied on P.R. for devising a similarly balanced approach to discovery, I would not oppose its use of P.R. However, the majority went further.

¶66 Specifically, the majority relies on P.R.'s holding that a contempt hearing was not a grand jury proceeding, and was thus free from the confidentiality that accompanies grand jury proceedings. Maj. op. ¶ 51 (citing P.R., 637 P.2d at 350–51). The majority's brief analogy to P.R., however, goes on to equate a contempt hearing to a hearing about

6

what evidence the grand jury will receive. That is where I disagree. That analogy misses several crucial distinctions between P.R. and the present case. To begin, a contempt proceeding is a distinct adjudicatory process that is filed in a different case from the grand jury and "is designed to vindicate the dignity and authority of a court" by compelling a witness to obey a lawful court order through fines or imprisonment. P.R., 637 P.2d at 350. As such, while the determination of whether to hold P.R. in contempt arose from the grand jury proceeding, that determination had no direct impact on the underlying grand jury proceeding itself. It was only about a potential sanction against P.R. herself. In short, P.R. was about what would happen to P.R. That is very different from the matter before us where the so-called "separate proceeding" will directly and immediately determine what evidence the grand jury actually hears in its ongoing investigation.

¶67 Further distinguishing this case from P.R. is the manner in which the hearing is triggered. In P.R., the prosecutor had complete discretion over whether to initiate the contempt proceeding; here, the defendant initiated the motion to quash. In the contempt matter, the prosecutor overseeing the investigation was able to determine whether to proceed with the contempt proceeding, and accordingly whether the risk to the ongoing investigation outweighed the benefits of a potential determination of contempt. Further, the prosecutor could tailor his disclosure by determining what evidence to offer and what questions to ask. In contrast, a motion to quash is initiated by the defendant on grounds he chooses, and the prosecution has no discretion to assess potential damage to the investigation. In that way, the subpoenaed party determines

7

what issues are in play and what evidence is required to address them. Thus, the prosecution is deprived of both control mechanisms it could use to protect the grand jury proceeding's confidentiality. Hence, I do not find P.R. persuasive.

¶68   The majority focuses on the fact that the prosecution inserted the wiretap intercepts into the proceeding when it filed its notice of hearing. By focusing on the prosecution's disclosure of the wiretapped information, it appears that the majority is referencing the evidentiary concept of "opening the door." That is not the issue here. The focus should be whether a hearing on a motion to quash a grand jury subpoena is part of a grand jury proceeding, not what is relevant at the hearing itself. What the prosecution offered in its notice of hearing is irrelevant to the question at hand. Even if the motion to quash is a distinct proceeding, I am also troubled by the breadth of the majority's holding.

¶69   The majority's decision today rejects the nuanced approach of P.R. and Lochiatto by holding that the current proceeding is a section 102(9) hearing. This ruling means that there is no equivalent of the protection that P.R. provided of closing the hearing if there were a clear and present danger to the grand jury proceeding. Paradoxically, the ruling today means that while the court could, in certain circumstances, close the proceeding to the public pursuant to P.R, it is not able to avoid the wholesale disclosure of ongoing investigatory materials to the investigated party under any circumstances. In effect, a suspect in a criminal investigation can get the wiretap application and documentation, but a reputable reporter for a news organization cannot sit in the courtroom for fear of hearing compromising confidential information. That is simply

not a disclosure regime that properly balances the parties' legitimate interests. The majority claims they are not addressing situations where the prosecution objects to turning over grand jury material, maj. op. ¶ 54, but the answer is clear: the prosecution has no recourse. The plain language of the statute controls and requires disclosure.

¶70 The majority tries to limit and qualify its holding by looking at who requested the hearing and who offered the wiretapped evidence, but this is both irrelevant to the question at hand, and not the limiting principle the majority believes it to be. The majority notes that the prosecution in this case asked for a hearing on the motion to quash, maj. op. ¶ 52, but that misses how things work in practice. Once the subpoenaed party has filed a motion, it must be resolved by a judge. Grand juries themselves do not resolve questions of whether evidence is admissible; they receive evidence. Hence, there must be a hearing which, in this instance, required that the prosecution disclose wiretap information.

¶71 The majority also fails to recognize that the evidence the prosecution offers at the hearing is necessarily determined by the grounds the defendant asserts to quash the subpoena. The majority argues that not every subpoena will involve wiretapped information, and so "a prosecutor could avoid triggering the statute by avoiding the use of wiretap contents while contesting a motion to quash." Maj. op. ¶ 54. In reality, unless the prosecution in this case wants to concede the motion to quash, it had to demonstrate to the judge why the crime-fraud exception applies, and that had to be established with the wiretap information, triggering section 102(9). It cannot be maintained that, in response to the motion to quash based on attorney-client privilege,

9

the prosecution could avoid offering or disclosing the wiretap information used to establish the crime-fraud exception. That said, this misses the larger point: A hearing on what evidence the grand jury will hear is part of a grand jury proceeding.

¶72 The core of my disagreement with the majority is that a hearing on the scope of a grand jury subpoena is not distinct from the grand jury proceeding itself. The subpoena in this case was issued based on information gathered during an ongoing investigation, and its purpose was to further that investigation by producing evidence for the grand jury. If the subpoena itself is a grand jury matter, I fail to see how a hearing on its scope is sufficiently differentiated as to be stripped of the normal provisions protecting grand jury confidentiality; the consequences of applying section 102(9) are the same, whether they apply to the subpoena directly or to a hearing on its scope. As previously stated, a hearing concerning evidence to be presented to a grand jury is part of a grand jury proceeding just as a hearing on an evidentiary motion in a criminal trial is part of a criminal proceeding.

¶73 The same logic applies in this case. The current proceedings began when the prosecution subpoenaed records from Brimah and M.W., who then challenged the subpoena. Brimah and M.W. do not challenge whether the subpoena was properly issued, nor whether it really concerns materials responsive to the investigation's purpose. They instead assert that the subpoenaed information is privileged. If no party challenges the notion that the subpoena's issuance furthers an ongoing grand jury investigation, it seems counterintuitive to hold that a hearing on the scope and procedure for discovery of allegedly privileged materials is distinct from the subpoena

10

itself. The determination of privilege here is not related to the unchallenged validity of the wiretaps—and so cannot conceivably bolster Brimah and M.W.'s challenge—yet the majority forces wholesale disclosure.

¶74 The dispositive question is whether the hearing on a motion to quash is a "hearing or other proceeding" under the statute. The particular facts are simply irrelevant to that determination under the plain language of the statute. Indeed, it is telling that the majority concludes that the present hearing falls under section 102(9) before considering the particular facts, and cites no statutory language when doing so. See maj. op. ¶¶ 52–54. Despite the majority's commendable effort to limit its holding, the factors it cites as limiting principles—who requested the hearing, who offered the wiretap information—are simply not relevant to the question of whether the proceeding is part of a grand jury proceeding or not, the sole question governing applicability of section 102(9). Going forward, it is difficult to see how a trial court could avoid section 102(9)'s mandate in an analogous situation. If a case involves wiretaps and a subpoena is challenged, regardless of who requested the hearing, it now appears that section 102(9) applies.

¶75 In my view, the hearing in this case is part of a grand jury proceeding and not a hearing for purposes of section 102(9). By extension, I would also conclude that grand jury proceedings are not subject to section 102(9) because practical experience, legislative history, and federal authority clearly demonstrate that section 102's undifferentiated disclosure mandate is particularly ill-suited to the sensitive, confidential nature of an ongoing grand jury investigation. I would remand to the trial

11

court with instructions to balance Brimah and M.W.'s actual need (if any) for confidential investigatory materials with the potential harm to the grand jury.  Because the majority rejects this balanced approach in favor of the blanket disclosure of section 102(9), I respectfully dissent from section III.B.

I am authorized to state that JUSTICE COATS joins in this concurrence in part and dissent in part.